# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LILLY LEA PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0290-JTL |
| | ) | |
| DIETER WALTER NEUPERT and CÔTE D'AZUR ESTATE CORPORATION, | ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE BGO FOUNDATION, | ) | |
| | ) | |
| Relief Defendant. | ) | |
| | ) | |
| ------------------------------------------------------ | ) | |
| CÔTE D'AZUR ESTATE CORPORATION, | ) ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LILLY LEA PERRY, | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  February 5, 2019
Date Decided:  February 15, 2019

Jeremy D. Anderson, FISH & RICHARDSON P.C., Wilmington, Delaware; *Counsel for Lilly Lea Perry.*

Norris P. Wright, William M. Kelleher, Phillip A. Giordano, GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, Delaware; *Counsel for The BGO Foundation.*

Douglas D. Hermann, James H. S. Levine, PEPPER HAMILTON LLP; *Counsel for Côte d'Azur Estate Corporation.*

Dieter Walter Neupert, *pro se*.

**LASTER, V.C.**

The parties dispute who owns the equity of defendant Côte D'Azur Estate Corporation. The entity came into existence in 2001 as a single-member, member-managed, Delaware limited liability company named Côte D'Azur Estate LLC. Non-party Israel Igo Perry was its sole member. Israel died in 2015, survived by plaintiff Lilly Lea Perry (his wife) and non-parties Tamar and Yael Perry (their daughters).[1] Lilly contends that Israel was the LLC's sole member when he died and that his interest in the LLC passed to his estate. The disposition of the estate is currently subject to probate proceedings in the United Kingdom.

In 2016, as part of the events giving rise to this litigation, defendant Dieter Walter Neupert filed a certificate of conversion with the Delaware Secretary of State that converted the company into a corporation. For simplicity, this decision refers to the entity in both manifestations as the "Company." Neupert also filed a new certificate of incorporation for the Company that authorized 10,000 shares of stock, and he prepared minutes and a share certificate which purported to document the fact that all of the Company's shares were owned by The BGO Foundation (the "Foundation").[2] Lilly asserts

---

[1] To avoid confusion, this decision uses first names to refer to members of the Perry family. Some of the exhibits that the parties introduced into evidence refer to Lilly as "LLP" or "LP" and Israel as "IIP" or "IP." Israel also used the alias "Ivor Friedman," which appears at times in the exhibits.

[2] The Foundation originally was named the Ludwig-Polzer-Hoditz Foundation. In 2015, it changed its name to The BGO Foundation. Both of these names and their abbreviated versions, such as "LPH" and "BGO," appear in the exhibits. The name change does not matter for purposes of this decision.

1

that Neupert had no authority to take these actions.

The Foundation is a private Liechtenstein foundation, which is an entity roughly analogous to a Delaware statutory trust. The Foundation is one of over thirty entities comprising Israel's complex estate plan, which he and his advisors called "the Structure." Neupert, a Swiss attorney, was the chief architect of the Structure. Non-party Lopag Trust, a Swiss commercial trust company, formed and manages many of the entities in the Structure, including the Foundation. Principals and employees of Lopag, including non-party Dominik Naeff, served on the Foundation's governing board of trustees and acted on its behalf. Neupert was a co-founder of Lopag, and he served on its governing board when he took the actions that Lilly challenges.

Lilly originally sued the Company and Neupert, seeking to invalidate the conversion and establish her beneficial ownership of the Company's equity in her capacity as Israel's sole heir under his last will and testament. She subsequently moved for and received leave to add the Foundation as a relief defendant. The Foundation responded by moving to dismiss the complaint for lack of personal jurisdiction. I deferred ruling on the Foundation's motion, holding that an evidentiary hearing was necessary to resolve whether personal jurisdiction existed.

A Delaware court can exercise personal jurisdiction over a non-resident co-conspirator who knew or had reason to know that the conspiracy had a Delaware nexus. Lilly proved that the Foundation and Neupert conspired to seize the Company's equity, thereby extinguishing her beneficial interest and engaging in the tort of conversion. Lilly proved that as part of that conspiracy, Neupert caused corporate documents to be filed with

2

the Delaware Secretary of State, establishing the necessary Delaware nexus. Lilly proved that Naeff and his colleagues at Lopag, acting on behalf of the Foundation, helped Neupert develop his plan and assisted him in his efforts. These activities support the exercise of personal jurisdiction over the Foundation as Neupert's co-conspirator.

In response to Lilly's contentions, the Foundation and its co-defendants claim they could not have engaged in a conspiracy because (i) the Foundation already owned all of the equity in the Company long before Neupert acted in 2016, and (ii) the Foundation granted Neupert a power of attorney in February 2016, executed in its capacity as the Company's sole member, which authorized Neupert to act as he did. The defendants ground their claim on a deed of assignment that Israel executed on May 1, 2013 (the "Deed of Assignment"), which recites that he was assigning his equity interest in the Company and three other entities to the Foundation.

The Deed of Assignment did not effectuate a transfer of Israel's member interests to the Foundation, nor could it have resulted in the Foundation becoming the Company's sole member. The Deed of Assignment documented Israel's intent to make an *inter vivos* gift. Israel never completed the gift, both because he never delivered his member interests to the Foundation, and because the Deed of Assignment was not an effective donative instrument. When signing the Deed of Assignment, Israel did not intend to accomplish an immediate transfer of his equity; he wanted to evaluate the tax implications of the move before completing it. The transfer was never completed. Instead, Israel revoked the gift in December 2013 when he decided not to complete the transfer because of adverse tax consequences in France.

3

Assuming counterfactually that Israel had intended for the transfer of interests to be immediately effective, the transaction could not have resulted in the Foundation becoming the Company's sole member. The transfer at most would have resulted in the Foundation becoming an assignee. Moreover, under the Delaware Limited Liability Company Act (the "LLC Act") as it existed in May 2013, the transfer would have resulted in the Company having no members, causing it to dissolve. Along this alternative timeline, the Foundation could not have become the Company's sole member and could not have authorized Neupert's actions.

The evidence proves that the Foundation's representatives knew that the Deed of Assignment was never implemented. Despite this knowledge, they caused the Foundation to participate fully in Neupert's scheme to assert control over the Company. They did so in an effort to coerce Lilly into accepting the disposition of Israel's property that Neupert and Lopag wanted to implement. As part of that scheme, the Lopag representatives helped Neupert manufacture documents to substantiate the Foundation's claim of ownership. Naeff and his colleagues at Lopag also sought to obtain a legal opinion attesting to the valid issuance of the shares. In an effort to secure a favorable opinion, Naeff and a Lopag colleague misled the law firm by withholding material information. When the law firm balked at issuing the opinion, Neupert claimed he could provide a power of attorney from the Foundation that gave him the power to act. In late September or October 2016, Lopag and Neupert manufactured the power of attorney and backdated it to February 5, 2016, ostensibly before Neupert filed the certificate of conversion and certificate of incorporation. In this court and elsewhere, the Foundation has aligned itself with Neupert,

4

asserted that it owns all of the Company's equity, and argued in favor of the effectiveness of the Deed of Assignment, the power of attorney, the conversion, and other manufactured corporate documents. The evidence shows that these claims are false.

Under the conspiracy theory of jurisdiction, the Foundation is properly subject to personal jurisdiction in this court as a relief defendant for purposes of claims challenging its ownership of the Company's equity. The Foundation's motion to dismiss for lack of personal jurisdiction is denied.

## I.  FACTUAL BACKGROUND

During a two-day evidentiary hearing, the parties introduced a total of 234 exhibits, and two fact witnesses testified live. The parties lodged two depositions and stipulated to the introduction of two affidavits from a third witness in lieu of live testimony. They submitted thirty stipulations of undisputed fact.[3]

For purposes of the hearing, two competing adverse inferences were in play. Because Neupert refused to be deposed and declined to appear at the hearing, I ruled that I

---

[3] Citations in the form "[Name] Tr." refer to witness testimony from the evidentiary hearing. Citations in the form "[Name] Dep." refer to witness testimony from depositions. Citations in the form "BX — at —" refer to exhibits that the Foundation introduced during the evidentiary hearing. Citations in the form "PX — at —" refer to exhibits that Lilly introduced. Pages are designated by the last three digits of the control number. The parties provided translations of PX 25, 93, 94, 98, 101, 102, 103, 104, 106, 109, 110, 111, 113, 122, 129, 131, and BX 5. *See* Dkt. 187. Quotations from these exhibits are drawn from the translations. In cases where I have edited the translation for clarity, I have provided the original text. Citations in the form "Stip. ¶ —" refer to stipulated facts. *See* PX 136; BX 61. As discussed in the Legal Analysis, I have found that Lilly is not bound by one of her stipulations. *See* Part II.A.1., *infra*.

5

could draw inferences in Lilly's favor and adverse to the Foundation based on any relevant testimony that Neupert reasonably could have offered.[4] Because Lilly failed to timely review Israel's home computer and to produce responsive documents that it contained, I ruled that I could draw inferences in the Foundation's favor and adverse to Lilly based on information that the computer reasonably could have contained.[5]

The burden of proof to establish facts supporting jurisdiction rests with the party asserting that jurisdiction exists.[6] The standard of proof is more flexible. "If the motion is decided on affidavits, the court should require only that plaintiff make out a *prima facie* case."[7] Eventually, however, the plaintiff must prove the facts necessary to establish

---

[4] Dkt. 173 at 68–71.

[5] Dkt. 175 at 31.

[6] *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 326 (Del. Ch. 2003); *see Hart Hldg. Co. v. Drexel Burnham Lambert Inc.*, 593 A.2d 535, 539 (Del. Ch. 1991) (Allen, C.) (explaining that plaintiff "bear[s] the burden to establish defendant's amenability to suit, if that issue is raised by a motion"); *Newspan, Inc. v. Hearthstone Funding Corp.*, 1994 WL 198721, at *1 (Del. Ch. May 10, 1994) (Allen, C.) ("On a motion that seeks to adjudicate the court's power over the person of a defendant, plaintiff bears the burden of showing by evidence some basis upon which a fact finder could find that the factual predicate for jurisdiction has been proven."). Some federal courts have held that "[o]nce a plaintiff has established minimum contacts, the burden shifts to the defendant to show the assertion of jurisdiction would be unfair." *Wein Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999); *see* 5B Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, & A. Benjamin Spencer, FEDERAL PRACTICE AND PROCEDURE § 1351 n.27 (3d ed. & Supp. Nov. 2018) (collecting other cases). Delaware courts have not adopted the burden-shifting approach.

[7] *Hart Hldg.*, 593 A.2d at 539.

personal jurisdiction "by a preponderance of the evidence."[8] If the court holds an evidentiary hearing on jurisdictional issues, then the court may make findings based on a preponderance of the evidence standard, or a court may use a less onerous "likelihood of success" standard.[9] In my view, a court would use the lower standard if the record presented at the evidentiary hearing provided some support for the assertion of jurisdiction but fell short of a preponderance. By asserting jurisdiction on a preliminary basis under the likelihood-of-success test, the court permits the case to proceed through discovery so that the court can make more definitive findings at trial.

This decision makes findings of fact based on a preponderance of the evidence. Using this standard is warranted given the thoroughness and persuasiveness of the factual record, which predominantly consists of contemporaneous emails that provide a detailed account of the parties' actions. Its use also recognizes the substantial overlap between key facts relevant to the personal jurisdiction analysis, such as the validity of the Deed of Assignment, and the ultimate merits of the case. It is fair to the parties to apply this standard because, except for Neupert, all of the parties participated fully in the evidentiary hearing

---

[8] *Id.*; *see Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 831 (5th Cir. 1986) ("However, 'at any time when the plaintiff avoids a preliminary motion to dismiss by making a prima facie showing of jurisdictional facts, he must still prove the jurisdictional facts at trial by a preponderance of the evidence,' or, as otherwise stated, '[e]ventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at a trial.'" (quoting *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 n.2 (9th Cir. 1977) and *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981))).

[9] *Newspan*, 1994 WL 198721, at *3 n.8.

and in the discovery leading up to it. Applying this standard is also fair to Neupert, because he could have participated, but chose not to. Moreover, for purposes of the issues litigated at the evidentiary hearing, Neupert's interests aligned with those of the other defendants. In addition, the law firm that represented the Company at the hearing had represented Neupert from the start of the case until April 6, 2018, seven weeks before the evidentiary hearing, and on May 11, 2018, submitted a letter to the court from Neupert.

As the party asserting that the Foundation is subject to jurisdiction, Lilly bore the burden to prove the necessary jurisdictional facts. Because the Deed of Assignment reflected an *inter vivos* gift, the Foundation, as donee, bore "the burden of establishing, by clear and convincing evidence, all facts essential to the validity of the purported gift."[10]

## A. The Structure, The Villa, And The Company

During his lifetime, Israel accumulated significant wealth. To protect his wealth and minimize its tax burden, Israel moved the bulk of his assets into the Structure—a web of more than thirty entities domiciled in jurisdictions around the world.[11]

The chief architect of the Structure was Neupert, a Swiss attorney and senior partner at Neupert Vuille Partners, a law firm based in Zurich, Switzerland.[12] Neupert describes himself as "an advocate specializing in aviation, banking, tax and cross-jurisdictional

---

[10] *Estate of Reed v. Grandelli*, 2015 WL 1778073, at *3 (Del. Ch. Apr. 17, 2015).

[11] *See* Naeff Tr. 78; BX 6; PX 20 at '151–52; PX 25; *see also* BX 5; BX 7.

[12] Stip. ¶ 3.

corporate law in Switzerland."[13]

Other key contributors to the Structure included Dominik Naeff, Louis Oehri, and Ann Naeff-Oehri. They are principals of Lopag, which is an acronym for Louis Oehri and Partners AG.[14] Neupert co-founded Lopag, held shares in the firm, and served as a member of its governing board until November 18, 2016, when he resigned from the board and sold his interest.[15]

One of Israel's assets was La Treille, a villa in the south of France (the "Villa"). To acquire the Villa and hold title to it, Israel caused the Company to be formed on May 1, 2001.[16] Its limited liability company agreement, also dated May 1, 2001, established a single-member, member-managed, Delaware limited liability company.[17] Israel was its

---

[13] Dkt. 33 Ex. 3 ¶ 1.

[14] *See* Naeff Tr. 7-8 (explaining that in 2009, he joined Lopag and "started to work for the family business of my father-in-law"). *See generally* Lopag, www.lopag.li/en/ (last visited Feb. 11, 2019). Some documents spell Naeff as "Näff." For consistency, this decision uses Naeff.

[15] *See* Dkt. 33 Ex. 3 ¶ 43.

[16] Stip. ¶ 9. The certificate of formation suggests it was formed on April 17, 2001, but the parties stipulated to a formation date of May 1. PX 1 at '028–29; *see also* PX 2. The difference is immaterial.

[17] PX 1 at '024-26.

sole member.[18] Later in May 2001, the Company acquired the Villa.[19]

## B.    The Deed Of Assignment

In mid-April 2013, Israel asked Neupert, Naeff, and Oehri to meet in Tel Aviv "in order to discuss the reorganization of the [F]oundation" and other estate-planning issues.[20] Israel was living under house arrest, so the meeting had to take place at his apartment.[21] According to public documents, Israel had been convicted of "embezzl[ing] more than £110m from a pension and insurance scheme that he set up in Israel in 1983."[22]

In preparation for the meeting, Lopag updated the governing documents of the Foundation.[23] At the time, the members of the Foundation's board of trustees were Naeff,

---

[18] PX 1 at '024 ("Mr. Israel Perry (the 'Member') is the sole member of the Company.").

[19] *See* PX 2.

[20] Naeff Tr. 11; *see* BX 3 (email dated April 24, 2013, confirming arrangements for meeting).

[21] Naeff Tr. 13.

[22] David Connett, Israel Fraudster Fights UK Attempt to Seize Assets, Independent (Mar. 18, 2012), https://www.independent.co.uk/news/uk/crime/israeli-fraudster-fights-uk-attempt-to-seize-assets-7576433.html; *see id.* ("The scheme was designed to exploit a deal between the then West Germany and Israel to permit eligible Israelis to receive a German state pension. Some 30,000 people signed up to it, including many who survived Holocaust death camps such as Auschwitz.").

[23] *See* BX 2 (Foundation bylaws referring to "the statutes of [the Foundation] dated 30.04.2013"); *see also* BX 5 (email dated April 30, 2013, from French attorney advising Neupert about reporting requirements for "a trust with French connections"). As noted, a Lichtenstein foundation is roughly analogous to a statutory trust. *See* Neupert Tr. 9 ("The BGO Foundation . . . is comparable to a trust."); BX 18 (describing the Foundation as "similar" to a trust). The "statutes" are its constitutive document, analogous to a trust

10

Oehri, and Markus Giger, a financial officer with Lopag.[24] Also in preparation for the meeting, Lopag prepared a series of documents for Israel to sign. Many of them would transfer aspects of his property to or among the various entities comprising the Structure.[25]

In one of the anticipated moves, Israel would transfer the Company's equity to the Foundation.[26] In preparation for the Tel Aviv meeting, tax counsel warned Neupert and Naeff that if the Foundation became the owner of the Company on or before June 15, 2013, it would have adverse tax consequences in France for the 2013 tax year.[27]

Neupert, Naeff, and Oehri flew to Tel Aviv on April 30, 2013.[28] On May 1, Neupert,

---

certificate or, for a corporation, the certificate of incorporation. The fact that the Bylaws refer to the "statutes" as dated April 30, 2013, suggest that the Foundation may have been formed in anticipation of the Tel Aviv meeting. BX 2. Naeff, however, testified that he had been a director of the Foundation since 2011. Naeff Tr. 7. I therefore infer that the Foundation's governing documents were amended or restated in anticipation of the Tel Aviv meeting. *See* BX 7 (agenda for Tel Aviv meeting referring to "renovation **and** expansion of the existing structure").

[24] *See* BX 2 at '106. At the time of the evidentiary hearing, the members of the Foundation's board of trustees were Naeff, Giger, Stefan Metzler, and Rupert Neudorfer. Naeff Tr. 8. Metzler and Neudorfer are affiliated with Lopag. *Id.*

[25] *See* BX 11 (email collecting and sending the many documents signed during the visit).

[26] *See* BX 6 (agenda for Tel Aviv meeting); BX 7 (same); *see also* Naeff Tr. 13 (agreeing that Israel may have mentioned the transfer in advance of the meeting).

[27] *See* BX 5 (Neupert sharing an email from French tax counsel with Naeff that explained that if a "trust owns any French situs assets (with the exception of financial investments)" before June 15, 2013, then the trustees of the trust would be subject to heightened reporting requirements).

[28] BX 4.

Naeff, and Oehri met with Israel in his apartment.[29]

During the meeting, Israel signed a document titled "Deed of Assignment." In its

entirety, it stated:

> The Undersigned, Israel I. Perry, born 23 April 1942, Israeli Passport No.
> 10922443 herewith assigns the entire share capital of the following
> companies
>
> 1.    Greetnwin.com Inc, Delaware/USA
> 2.    Solid Virgin Islands Ltd, BVI
> 3.    Cote d'Azur Estate LLC, Delaware/USA
> 4.    The Heritage Collection
>
> as well as
>
> > all the pieces of art listed in the ARTLID List
> > (pending approval by SOCA of the
> > items contained in their Chattel List)
>
> to the **LUDWIG POLZER-HODITZ FOUNDATION, LI-9491 Ruggell**
>
> a Foundation according to Liechtenstein Law
>
> The assignee herewith accepts the aforementioned assignment
>
> Ruggell, 1st May 2013[30]

Naeff and Oehri signed for the Foundation.[31]

---

[29] Stip. ¶ 14; Naeff Tr. 12.

[30] BX 8; *see* BX 11 at '182 (attaching Deed of Assignment as one of "the documents signed during the last visit in Israel").

[31] At the evidentiary hearing, the parties disputed the provenance of the Deed of Assignment. In August 2016, when Neupert falsely claimed to have rediscovered the Deed of Assignment (which he had known about all along), he wrote in two emails that he remembered typing it himself in Israel's apartment on Israel's computer. *See* PX 103; PX 98 at '971. Building on Neupert's emails, Naeff testified during the evidentiary hearing and Oehri averred in an affidavit that Neupert drafted the Deed of Assignment in Israel's

12

After the meeting ended, Naeff took the original back to Liechtenstein and kept it in his office.[32] On May 14, Naeff's secretary emailed Israel a copy of the executed Deed of Assignment along with other documents signed during the meeting in Tel Aviv.[33]

Although Naeff testified during the evidentiary hearing and Oehri averred in an

---

apartment on Israel's computer. *See* Naeff Tr. 107; BX 63 ¶ 2(e); *see also* Naeff Tr. 13–14. Lilly disputed this account, and I do not find it convincing. For one, the re-discovery of the Deed of Assignment was itself a false claim, and Neupert's emails are replete with other dubious assertions. For another, it seems much more likely that the Deed of Assignment was drafted in advance. Neupert, Naeff, and Oehri are careful, document-focused people. During their visit to Tel Aviv, they obtained signatures on numerous documents, and no one has suggested that the others (which are similar in form to the Deed of Assignment) were drafted on Israel's computer. *See* BX 11 (collecting documents signed during the Tel Aviv meeting). The transfers also appear to have been planned in advance, rather than something Israel thought of in Tel Aviv and asked Neupert to document on the fly. *See* BX 5; BX 6; BX 7. Neupert, Naeff, and Oehri notably took other steps in advance of the meeting, such as revising the Foundation's governing documents and obtaining tax advice on the transfers. *See* BX 2; BX 5. The advance preparation of the Deed of Assignment also explains why the signature block says "Ruggell," which is the town where Lopag has its home office. As with other documents that Lopag prepared, that notation reflects where the Deed of Assignment was created. *See* BX 6. For their part, the defendants have not been able to explain why a reference to Ruggell would appear on a document drafted in Tel Aviv.

It does appear that Neupert *edited* the Deed of Assignment and other pre-drafted documents during the meeting. *See* PX 138–39 (screen shots of eight versions of file titled "Deed of Assignment" on Israel's desktop); PX 140–147 (versions of document titled "Deed of Assignment" reflecting variations from final version). In any event, it does not matter for the purposes of determining the validity or effectiveness of the Deed of Assignment whether the document was drafted and signed in Tel Aviv, or prepared in Ruggell, edited in Tel Aviv, and then signed there. The Deed of Assignment was not an effective transfer because of other factors.

[32] Naeff Tr. 16.

[33] *See* BX 10 (Israel requesting documents); BX 11 (Naeff's assistant sending documents, including Deed of Assignment).

affidavit that they believed the Deed of Assignment effected an immediate transfer of the member interests in the Company from Israel to the Foundation,[34] the contemporaneous evidence tells a different story. Those documents show that Israel, Neupert, Naeff, and Oehri did not intend for the signing of the Deed of Assignment to implement an immediate transfer, because they wanted to avoid any adverse tax consequences for the Foundation during the 2013 tax year.[35] They believed that completing the transfer would require additional steps, and they planned to complete those steps after June 15.

## C. Israel Decides Not To Complete The Transfer.

On June 14, 2013, just before the key date for tax reporting in France, Naeff emailed Israel to start the process of formally effectuating the transfers contemplated by the Deed of Assignment.[36] He explained that he needed a "direct contact to the local representative (Trust Company or lawyer) that can assist us in doing the necessary [*sic*]."[37]

After not hearing back from Israel, Naeff sent the same email on June 25, 2013, to

---

[34] *See* BX 59 ¶ 6; Naeff Tr. 26–29, 37; *see also id.* at 26 (describing the actions taken after signing the Deed of Assignment as "solely an administrative process"). *But see id.* at 113 (Naeff: "I didn't really know how an LLC functions.").

[35] *See* BX 5.

[36] BX 13 ("We would like to register the following shares based on the Deed of Assignment," listing the Company, Greetnwin, Solid Virgin, and Heritage).

[37] *Id.* (original in bold and all caps).

Jennifer Risse, Israel's assistant in the United States.[38] He followed up on July 1, then again on July 16.[39] On August 8, Naeff asked Risse to have the Company's registered agent "provide the necessary documents (e.g. share transfer agreement)" to complete the transfer.[40]

On October 1, 2013, Risse put Naeff in touch with Augustin Partners, Israel's tax counsel in the United States.[41] Naeff asked them for help completing the transfers.[42] They "resigned shortly thereafter."[43]

Later that month, Risse told Naeff that she was "going to need the Trust Documents regarding . . . Cote D'Azur" and the other entities "in order to do the share transfer."[44] Naeff replied that his assistant would provide the information.[45] Risse arranged for the law firm of Wiggin and Dana LLP to begin representing Israel "in connection with the transfer of [his] ownership interests in Cote D'Azure" and the other entities addressed in the Deed

---

[38] BX 14 at '388; Stip. ¶ 17 ("Jennifer Risse was Mr. Perry's assistant in the United States up until Mr. Perry's death.").

[39] BX 14 at '387.

[40] *Id*.

[41] BX 16; *see* Naeff Tr. 29 (describing Augustin Partners as "tax counsel").

[42] *See* BX 16 ("**Can you support us in changing the shareholder / directors?**").

[43] Naeff Tr. 31.

[44] BX 17.

[45] BX 18.

of Assignment.[46] No one at the Wiggin firm ever spoke directly with Israel.[47] The Wiggin firm eventually prepared a set of draft documents to implement the transfer of the Company's equity, consisting of (i) a statement of assignment of Israel's member interest to the Foundation, (ii) a letter to the Company from Israel advising the Company about the Deed of Assignment and the statement of assignment, and (iii) an amendment to the Company's LLC agreement to reflect the Foundation as a new member.[48]

On November 5, 2013, Naeff checked in with Risse about the status of the transfer, which still had not been completed.[49] When Naeff followed up a week later, Risse told him that she was giving the attorneys "all the information" and that "[i]t's going to take some time."[50] Throughout November and early December 2013, Naeff continued to follow up with Risse.[51]

---

[46] PX 5 at '372; *see* Stip. ¶ 15 ("Mr. Perry first contacted Wiggin and Dana LLP through Jennifer Risse, on October 14, 2013"); *id.* ¶ 18 ("Jennifer Risse was a point of contact for Wiggin and Dana's representation of Mr. Perry and served as a conduit for communications and legal advice between Mr. Perry and Wiggin and Dana.").

[47] Stip. ¶ 16.

[48] Stip. ¶ 21; *see* BX 21.

[49] BX 20 (email from Naeff to Risse: "How far are the attorneys with the transfer of shares of . . . COTE D'AZUR . . .").

[50] *Id.*

[51] PX 8 (email dated November 28, 2013, from Naeff to Risse: "Please tell me how far they are. Who are the attorneys in charge and why does it take that long?"); BX 22 (email dated December 6, 2013, from Naeff to Risse: "[W]here are we with the transfer of shares."); *see also* PX 11 (email dated December 10, 2013, from Naeff to Neil Duggan, another of Israel's advisors, asking for help completing the documents: "[W]e would

16

Finally, on December 6, 2013, Risse circulated the documents from the Wiggin firm to both Naeff and Israel. She asked Israel to "look them over and let me know if they are good."[52]

Israel never executed the documents.[53] Naeff followed up with Risse on December 11, 2013, but Israel still had not approved them.[54] On December 23, Naeff emailed Israel directly: "Based on the Deed of Assignment, signed on 01 May 2013, both, Greetnwin.com INC and Cote D'Azur Estate [*sic*] should have been transferred to [the Foundation]. Is there any reason from your side not to execute this transactions [*sic*]?"[55] Israel seemed to approve transferring the Company's equity, responding: "There is no reason why not to transfer the cote d'azure [*sic*] shares. We are checking now, weather [*sic*] the transfer of GnW shares would be considered as a tax event in the USA."[56] But subsequent documents

---

appreciate if this could be finished after 6 months of continuous efforts. Do you have concrete plans to visit US? Eventually this could help to increase pace.").

[52] BX 21.

[53] Stip. ¶¶ 23–26; Naeff Tr. 132.

[54] BX 23 (email dated December 11, 2013, from Risse to Naeff: "I have not received an okay from Mr. P. yet.").

[55] BX 23. During the evidentiary hearing, Naeff testified that he was asking in this email "whether this transfer should be—should be canceled." Naeff Tr. 127. That testimony inverts the obvious meaning of the email. It was not credible.

[56] BX 24. Naeff testified at the evidentiary hearing that he interpreted Israel's statement to mean that the Deed of Assignment had been "immediately effective." Naeff Tr. 40. Were that the case, then there would not have been any need for further steps, and Naeff would not have kept trying to complete the transfer. *See, e.g.*, BX 25 (email dated

establish that Israel decided not to complete the transfer to avoid adverse tax consequences in France.[57]

## D. The Status Of The Company At Israel's Death

Israel died on March 18, 2015. At the time of his death, no further action had been taken to implement the transfer of the Company's equity. As noted, Israel had decided not to complete the transfer to avoid tax consequences in France, and he never signed the documents that the Wiggin firm prepared.

---

February 25, 2014, from Naeff to Duggan stating "Transfer of Côte D'Azur Estate LLC . . . still not finalized. See assignment agreement, dated 01.05.2013. Still being progressed.").

[57] *See* BX 26 (email dated March 28, 2015, from Naeff: "This is [*sic*] assignment is known to us, but it was never executed as far as we are aware. And I'm glad about it with respect to Cote d Azure since reporting obligations in France (relevant due to the Villa in France) became very strict "); PX 27 (email dated September 17, 2015, from Risse: "Mr. Perry was the sole member and this was done for tax reasons. . . . Regarding transferring the shares to the Trust. I have attached his draft documents which we never went any further with per IP."); *see also* PX 25 at '058 (email dated August 28, 2015, from Neupert: "According to French law it is absolutely legal for the Delaware company to be [part of the Structure]—IIP simply wanted to save the 3% yearly flat tax and therefore [identified himself as] the ultimate beneficiary"; translated from "Nach französischem Recht ist es absolut legal, wenn die Delaware Gesellschaft in einer Struktur eingebunden ist - IIP wollte einfach die 3% jährliche Flat Tax aparen und hat sich deshalb als Ultimate Beneficiary geoutet"); PX 94 at '554 (email dated July 18, 2016, from Naeff: "Until his death the settlor was the sole shareholder of Côte d'Azur LLC, Delaware, an entity that holds a property in France. At some point the plan was to bring this company into one of the trusts (and the [Letter of Wishes] also provided for that). Since France does its best (taxes, reporting etc.) to torpedo such structures, this idea was dismissed."); PX 103 at '617 (email dated August 10, 2016, from Naeff: "IIP endowed the Cote d'Azur shares to the Foundation. Initially we had no access and later on we did not implement it due to the consequences in France."); Naeff Tr. 171–72. The Company never listed the Foundation as its owner on any of the its tax filings. *See* BX 29; BX 44; PX 79.

When Israel died, his immediate family consisted of his wife Lilly and their two daughters, Tamar and Yael.[58] Israel named Lilly as his sole heir in his will, and his estate would be subject to probate in the United Kingdom (the "UK Estate"). Israel's will named Neupert as his executor,[59] but because of disputes that later arose between Neupert and Lilly, Neupert was never appointed to that role.[60]

Under Israel's complex estate plan, only personal property that Israel owned at his death would pass under his will. Israel had transferred all of his other property to the Structure. Control over the transferred property rested with the advisors who controlled the entities in the Structure. To specify what he hoped they would do with the property, Israel dictated a document called the "Letter of Wishes."[61] The advisors were not legally bound to follow the Letter of Wishes, but as a business matter they would attempt to fulfill their client's requests.[62]

After Israel's death, Lilly, Tamar, and Yael wanted to know what would happen to the Villa, which represented approximately twenty percent of the family's wealth.[63] In the

---

[58] Stip. ¶ 2.

[59] BX 15 at '178.

[60] Naeff Tr. 159.

[61] Stip. ¶ 4; *see* PX 19.

[62] *See* Naeff Tr. 64.

[63] *See* Naeff Tr. 94–95.

Letter of Wishes, Israel had expressed a desire for the Villa to be transferred to a trust for Lilly's benefit.[64] Approximately one week after Israel's death, however, a lawyer representing Tamar found a copy of the Deed of Assignment. He asked Naeff about it.[65] On March 28, 2015, Naeff responded, copying Neupert:

> This is [*sic*] assignment is known to us, but it was never executed as far as we are aware. And I'm glad about it with respect to Cote d Azure since reporting obligations in France (relevant due to the Villa in France) became very strict in the meantime and we have to plan the transfer into THE LIZA TRUST carefully now. Who can inform us about the actual shareholders/directors of Cote d Azure?[66]

At the evidentiary hearing, Naeff testified that by "never executed" he meant "that this transfer has not been completed or finalized."[67] That is consistent with the evidentiary record before Israel's death.

---

[64] *See* PX 19 at 454. The Letter of Wishes described a series of trusts that had received portions of Israel's property. *See* PX 19 at '450–51; Lilly Tr. 266; Naeff Tr. 66. The Foundation has argued that this case should be moot because Israel transferred the equity to a trust for Lilly, and the Foundation claims the trust has the "same potential beneficiaries as does the Foundation." Dkt. 182 at 26; *see* Naeff Tr. 55 ("The circle of potential beneficiaries in the trust and in the foundation are identical."). Delaware respects distinctions among entities, and it is not possible for this court to ignore the distinction between a trust for Lilly's benefit and the Foundation. Moreover, the key distinction is not between the Foundation and the trust, but rather between the Foundation and the UK Estate. If the Company's equity is part of the UK Estate, then the parties with a beneficial interest in the Company's equity will include Israel's creditors, who would have priority over Lilly's residual interest.

[65] BX 26 at '870 (email dated March 27, 2015 from Tamar's attorney with the subject line: "herewith is an assignment of Cote d Azure and Greetnwin - pls check").

[66] *Id.*

[67] Naeff Tr. 53.

20

Shortly thereafter, Naeff circulated a chart of the Structure. He did not know where to put the Company, writing "??? TRUST."[68] He did not assert that the Foundation owned the Company's equity. In August 2015, Naeff circulated an updated version of the chart. This time he listed the Company as owned by "IIP {personally}."[69]

Based on their conclusion that Israel owned the Company's equity when he died and that it passed to the UK Estate, Lopag representatives repeatedly told Lilly that the Villa was her responsibility. While alive, Israel personally paid for the maintenance expenses of the Villa.[70] After his death, Lilly asked Naeff and other Lopag representatives to have the Foundation cover the maintenance expenses.[71] They consistently told her that the Foundation did not own the Company, could not take any action with respect to the Villa, and would not cover any expenses.[72]

---

[68] PX 20 at '151–52.

[69] PX 21 at '033; *see* Naeff Tr. 201.

[70] Naeff Tr. 68; Lilly Tr. 236.

[71] *See* BX 27 at '441 (email dated July 7, 2015, from Lilly's accountant requesting a top-up of Lilly's account and explaining that Lilly has been forced, since, "to pay the French bills" out of her personal funds); *see also* PX 96 (redacted email chain between Naeff and Neupert following up on Lilly's email).

[72] *See* PX 23 (email dated August 17, 2015, from Neupert to property manager, copying Naeff: "[W]e should not forget that formally all agreements concerning the Villa should be concluded by the owner, ie. Cote d' Azur Real Estate LLC, Delaware . . . Formally the late Mr. Perry had declared to be the sole sharholder [*sic*] of the company, so – from a legal point of view – the shares in the Company fall under the UK Probate."); PX 26 (email dated September 17, 2015, from Naeff to Monsenego, Neupert, and others: "La Treille belongs to the estate"); PX 36 (email dated November 23, 2015, from Neupert to Tamar, Naeff, and a property manager noting that the Company belongs to the "personal

## E.    The Threat Posed By The UK Probate Proceedings

After Israel's death, Neupert and the principals of Lopag attempted to carry out the desires that Israel expressed in the Letter of Wishes.[73] They hoped to broker a global settlement among Lilly, Tamar, and Yael that would achieve that result.[74] But Neupert recognized that the probate process threatened the family's ownership of the Villa. Because Israel had owned the Company's equity personally when he died, the equity was part of the UK Estate and subject to the claims of Israel's creditors, including a class action seeking to recover millions on behalf of the pension funds that Israel had been convicted of

---

assets of IIP"); PX 37 (email dated November 25, 2015, from Neupert to Tamar, copying Naeff, Yadlin, and Duggan and explaining that "[t]he assets [of Israel] certainly include the shares in Côte d'Azur Real Estate LL.C. [*sic*]"); PX 38 (email dated November 25, 2015, from Neupert to Tamar noting that the Company was "held privately by your father"); PX 14 at '645 (email dated December 15, 2015, from Naeff to Tamar: "La Treille is held by Cote d'Azur Real Estate and a[s] such part of the estate. We are neither shareholders nor directors, so we can only act based on goodwill of the involved."); PX 99 at '928 (email dated August 1, 2016 from Naeff-Oehri to the property administrator: "Maybe you are not aware that there is still no agreement between the Trusts and Lilly - therefore (and as Lilly has been declared to be the owner of La Treille towards the French Tax Office) would you be so kind to tell her that she is personally responsible for the maintenance costs of the Villa."); *see also* Naeff Tr. 69. At times, Lopag provided some funds to maintain the Villa from another entity in the Structure. *See* BX 31; BX 35; BX 37; PX 39; PX 44; Naeff Tr. 68–69.

[73] *See* PX 98; Naeff Tr. 15.

[74] *See* Naeff Tr. 55 (explaining that "not all family members agreed with the letter of wishes"); *id.* at 202 ("Between March 2015 and the summer of 2017, these settlement talks were taking place. And some of the survivors were not willing to accept the letter of wishes.").

defrauding.[75] Having the Company's equity pass through the UK Estate would also result in significant tax liabilities.

Neupert wanted to claim that the Company's equity was not part of the UK Estate but rather part of the Structure. In August 2015, he asked Naeff to find documents that would enable Neupert to "show that [the Company] was somewhere in the [S]tructure."[76] Later that month, Neupert told Naeff that they needed documentation that would enable them to appoint a new director for the Company who could issue equity to show that the Company was part of the Structure.[77] Naeff agreed that they needed someone with authority to issue equity, and he asked whether Neupert could sign the necessary documents as Israel's executor under the will.[78] Neupert responded that if he signed the necessary documents in his capacity as executor, then they could not avoid having the equity become

---

[75] *See* PX 92 at '563 (citing a class action).

[76] PX 24 at '643.

[77] *See* PX 25 at '060 ("How far have you gotten with the documentation of Côte d'Azur Estates LLC – after all, we need a new director and would possibly have to bring the shares into [the Structure].").

[78] *Id.* ("In the U.S., we have so far concentrated on Greetn'win und Solid ISG Capital US, because these companies are part of the structures controlled by us. In terms of Cote d'Azure Estates LLC, the question is who is authorized to sign resolutions or a transfer of shares. Can you do that in your function as executor? Purely formally, we now know how changes of directors and shareholders work in Delaware and we could prepare the documents. In case the shares are being transferred, the tax consequences in France will definitely be a topic.").

part of the UK Estate.[79]

At this point, Naeff remembered the Deed of Assignment and suggested that it provided a way to create a document trail that would place the Company within the Structure:

> I see a starting point here. On [May 1, 2013], IIP signed an assignment of Côte d'Azure Estates LLC to the Foundation. Therefore, the Foundation could also appoint a new director. However, I believe that that would have tax consequences in France. It is well known that the rules there are very strict.[80]

Neupert agreed that Israel had never implemented the transfer because of the tax consequences in France.[81] But he thought using the Deed of Assignment seemed promising

---

[79] *See id.* at '059 ("Since it was IIP's idea to [move] the properties into the [S]tructure, we can simply issue new shares to [the Foundation] or one of the trusts (to be signed by the new director); I cannot act in this connection as the executor, because they the shares would become part of the estate and, in accordance with the U.K. last will, would automatically become the property of Lilly. In France we could still declare Lilly as [the ultimate beneficial owner], once the settlement is signed – the date for the meeting between Zeev Scharf with Lilly's new attorney has just been postponed from August 31 to September 11"; translated from "Nachdem die Idee von IIP ja war, dass die Liegenshaften in die Struktur eingebunden warden sollten, könnten wir einfach neue Shares auf BGO oder einen der Trusts asstellen (durch den neuen Director zu unterzeichnen), als Testamentsvollstrecker kann ich nicht aktiv warden, da die Aktien sonst Bestandteil des Nachlasses würden. In Frankreich können wir immer noch Lilly als WB angeben, wenn einmal der Vergleich unterzeichnet ist – das Datum für das Treffen von Zeev Scharf mit dem neuen Anwalt von Lilly bei uns wurde soeben vom 31. August auf den 11. September verschoben.").

[80] *Id.* at '058.

[81] *See id.* ("According to French law it is absolutely legal for the Delaware company to be [part of the Structure] – IIP simply wanted to save the 3% yearly flat tax and therefore [identified himself as] the ultimate beneficiary.").

24

and asked for a copy. [82] Naeff sent him a .pdf version. [83]

After this exchange, Naeff and Neupert evaluated how to use the Deed of Assignment to claim that the Company was not part of the UK Estate. As part of this process, in September 2015, Naeff obtained from Risse the documents that the Wiggin firm had prepared to effectuate the transfer of the Company's equity. Risse confirmed that the transfer had not been completed:

> I have attached the documentation that I have passed around for Cote d'Azur. There wasn't a director, Mr. Perry was the sole member and this was done for tax reasons.
>
> If you recall, I had spoken to someone at Wiggin and Dana, Mark Kaduboski, in December of 2013. *Regarding transferring the shares to the Trust. I have attached his draft documents which we never went any further with per IP*. [84]

Naeff immediately forwarded Risse's email and the attachments to Neupert. The Foundation redacted the text of Naeff's email.

Naeff and Neupert also evaluated what ownership options within the Structure would be optimal from a tax perspective. They believed that once they deployed the Deed of Assignment to remove the shares from the UK Estate, then they could document

---

[82] *See id*. ("[W]ould you still have a copy of the [Deed of Assignment] for me (I probably prepared it myself at the time in Tel Aviv)?"; translated from "hattest Du mir noch eine Kopie der Widmung vom 01.05.2013 (wahrscheinlich habe ich die damals sogar selber in Tel Aviv aufgesetzt)?").

[83] *See id.* (email from Naeff to Neupert: "You will find the [Deed of Assignment] in the attachment"; translated from "Die Widmung finds du im Anhang.").

[84] PX 27 (emphasis added).

whatever internal ownership allocation they wished, as long as the family members agreed.[85]

## F.     Interactions With The French Lawyers

For help on the tax questions, Naeff and Neupert contacted Julien Monsenego, a lawyer with Olswang France LLP, who had advised Israel on tax matters involving the Company.[86] Naeff described various ownership allocations that Israel's surviving family members might agree to and asked about the tax consequences. He wrote:

> With respect to the ownership of the LLC the situation is as follows:
>
> IIP was the sole member of the LLC according to the LLC - documentation available to us. But there is an assignment agreement from 01.05.2013 as well in which IIP assigned his shares in the LLC to a foundation. From my point of view we should focus on the feasible future options now and then decide what needs to be done to document the transfer properly.
>
> **Starting point:** until his demise IIP was reported as the UBO ["Ultimate Beneficial Owner"] of the LLC
>
> What would be the one-off and future (tax-) consequences if the ownership of the LLC would change to:
>
> a) The heirs (e.g. 40% to his wife and 30% / 30% to his both children)
>
> b) To the foundation or to a Trust (discretionary)
>
> c) To the foundation or to a Trust (with named beneficiaries)

---

[85] *See* PX 25 at '058 ("Following the execution of the settlement between the Israeli attorneys that will hopefully take place on September 11, we can then proceed to the tax optimization, for example by declaring Lilly as the beneficiary to the tax authorities instead of IIP, but internally making sure the property remains with the family.").

[86] *See id*. at '059 (describing Monsenego as "the tax advisor for Cote d'Azure Estates LLC in France").

I think these are ultimately the options. Furthermore would there be a benefit to transfer ownership of La Treille from the LLC to a SCI [i.e. a French real estate investment company]? At the end we need a solution that is 100% compliant to the legislation in France.[87]

Notably, Naeff proposed taking a malleable approach towards ownership. He felt the advisors should "focus on the feasible future options now and then decide what needs to be done to document the transfer properly."

Unlike Naeff and Neupert, Monsenego and his colleagues at Olswang cared about the historical facts and were not comfortable manufacturing a different ownership allocation. After receiving Naeff's email, the Olswang lawyers asked for confirmation that the Company's equity had been transferred to and registered with the Foundation.[88] Naeff drafted a proposed response, which he sent to Neupert. It stated: "IIP assigned on 01 May 2013 the LLC to the foundation but the transfer has never been registered in a register of members or similar according to our knowledge."[89] After consulting with Neupert, Naeff did not send his response. Instead he told Olswang that he would respond to their questions after consulting with Lopag's lawyers.[90]

---

[87] PX 28 at '672; *see* Naeff Tr. 62 (explaining that "during the settlement talks, many options were discussed").

[88] *Id*. at '670 ("We understand from your email below that the shares in the LLC have been transferred in May 2013 to a Liechtenstein foundation. Has the transfer been registered in the shareholders' registry (or other similar document) of the LLC?").

[89] *Id*. (original text is entirely capitalized).

[90] BX 33 at '302.

One month later, on October 20, 2015, Naeff finally responded to Olswang. He abandoned any reliance on the Deed of Assignment, stating flatly: "IIP was the sole shareholder of Cote D'Azur Estates LLC until his demise in March 2015."[91] On October 26, 2015, Neupert followed up with Olswang and confirmed Naeff's representation.[92]

## G.    The French Tax Audit

In March 2016, French tax authorities began auditing the Company. Olswang represented the Company.

The Company's tax filings in France had always identified Israel as the ultimate beneficial owner of the Company's equity. To respond to the French government's inquiries, Olswang needed a certification confirming that this representation had been true in 2013 and 2014.[93] Neupert claimed that it was impossible to certify that Israel had owned the Company's equity because the "files were lost (hidden somewhere in a bankruptcy courthouse)."[94] As a solution, he proposed obtaining a certificate under false pretenses from a Delaware registered agent:

---

[91] *Id*. at '301. Lopag's advisors prepared the response at a meeting the previous day. PX 30 at '160.

[92] PX 32 ("Formally 100% of the shares in [the Company] were held by the late Mr Perry . . . . Pending the execution of his Last Will, the shares now belong to the community of heirs."); *accord* PX 46 at '115 (email dated February 29, 2016, from Neupert: "[I]t was discovered that the widow of Mr Perry [, Lilly,] will inherit 100% of the shares of the Company owning La Treille according to Mr Perry's Last Will.").

[93] *See* PX 53 at '473, 475.

[94] *Id*. at '472.

[A]s I do not have the grant of authorisation from the British Probate Court, the only way around was to convince the new registered agent in Delaware, The Company Corporation, that I am the Executor of the Last Will and therefore the legitimate new Director of Cote d'Azur (fortunately in Delaware they do not know anything about UK probate procedure).[95]

Neupert had started this process in September 2015 when he reached out to the registered agent to obtain a Certificate of Good Standing.[96] When doing so, he claimed to be the "executor of the Last Will of Mr Israel Perry," even though this issue was being contested in the probate proceedings and Neupert had never been (and never was) appointed to that role.[97] In March 2016, he again approached the registered agent and again claimed falsely that he was the "Executor of Mr Perry's Last Will."[98]

Olswang needed to respond to the French tax authorities by the end of March 2016, but Neupert expected it would be a few weeks before he could obtain documentation from Delaware. As a substitute, Neupert offered to provide "a letter from me addressed to [Monsenego] in my capacity as the Executor of the Last Will that IP was the only shareholder of Cote d'Azur Estate LLC from its incorporation until [his] death."[99] After

---

[95] *Id.*

[96] *See* PX 29. The Lopag advisors were aware of Neupert's actions. PX 30 at '160 (minutes of meeting among Lopag advisors dated October 19, 2015: "Company currently not in good standing. D. Neupert in contact with registered agent in Delaware.")

[97] PX 29 at '575; s*ee* Naeff Tr. 149.

[98] PX 54 at '298.

[99] PX 59; *see* PX 60.

Monsenego expressed concern about alerting the French tax authorities to Israel's death, Neupert offered to provide "a confirmation of the ownership of Mr Perry in my capacity as Director of Cote D'Azur Estate LLC,"[100] even though he knew that he did not have any role with the Company. Facing the deadline, Monsenego sent the tax authorities a letter from Neupert stating that Israel owned the Company's equity during 2013 and 2014.[101]

As part of this process, Neupert circulated a document he had received from the registered agent in Delaware.[102] It was a resolution appointing Neupert as manager of the Company (he claimed it appointed him as a director).[103] The signature line read, "Lilly Perry[,] Member."[104]

Tamar objected, complaining that Neupert had no authority to declare that Lilly owned the Company.[105] Neupert told her that Lilly had to be listed as the owner because

---

[100] PX 63.

[101] *See* PX 69 at '986–87; PX 70 at '761. In May 2016, Olswang asked Neupert to "confirm that [the Company] was not contributed to the [Foundation]." BX 43 at '976. Neupert confirmed that Israel "was indeed the owner of the shares until his death." BX 43 at '974. Neupert copied Naeff on the email.

[102] PX 65.

[103] *Id.* at '880. The resolution was a standard form document. It ignored the fact that the Company was a member-managed LLC.

[104] *Id.* (formatting altered).

[105] PX 68 at '533, 535.

she was the sole heir under Israel's will.[106] The dispute continued for more than a week, during which Neupert maintained that the Company's equity was part of the UK Estate.[107]

## H.    The Rift Between Neupert And Lilly

Ever since Israel's death, Neupert and Lopag worked to broker an agreement among Lilly, Tamar, and Yael that would resolve their competing claims to Israel's assets and fulfill as nearly as possible the desires Israel expressed in the Letter of Wishes.[108] By spring 2016, a division had emerged among the members of Israel's immediate family, with Yael on one side and Lilly and Tamar on the other. Neupert and Lopag aligned themselves with Yael. Other advisors sided with Lilly and Tamar.[109]

To resolve one part of the dispute, Neupert tried to reach agreement on the Company's ownership. In substance, he proposed that Lilly receive title to the Villa, but commit that ownership would pass equally to Tamar and Yael when she died. The family members' use of the Villa and their responsibility for maintenance costs would be governed by the Letter of Wishes.[110]

As part of his efforts to advance this proposal, Neupert repeatedly asked Lilly to

---

[106] *Id*. at '532.

[107] *See* PX 68; PX 73; PX 119.

[108] *See* Naeff Tr. 55–56 (explaining that "not all family members agreed with the letter of wishes" and describing efforts to achieve a settlement).

[109] *See* Naeff Tr. 54, 63–64, 75–76; PX 102.

[110] PX 74.

sign the resolution from the Delaware registered agent in which she purported to act as sole member of the Company to appoint Neupert as manager.[111] Lilly refused to sign.[112]

## I.     Neupert Takes Control Of The Company.

After Lilly's refusal, Neupert seized control of the Company. He first emailed the registered agent, telling them: "We would like to transform the LLC into a corporation, so instead of a member we would have a 100% shareholder. Would you be so kind as to prepare the necessary forms?"[113]

On June 30, 2016, Neupert caused a certificate of conversion to be filed with the Delaware Secretary of State that converted the Company from an LLC into a corporation.[114] He also caused a certificate of incorporation for the Company to be filed that authorized the issuance of up to 10,000 shares of common stock.[115]

Neupert next informed Olswang that the family members and their advisors "were

---

[111] PX 78; *see* PX 77; PX 83; BX 45.

[112] *See* PX 83.

[113] PX 85 (formatting altered).

[114] Stip. ¶ 28.

[115] *Id.* ¶ 30. According to minutes of a board meeting dated July 1, 2016, Neupert and Tanja Tandler, one of his personal assistants, acted as the sole directors of the Company to appoint Neupert as President. They then issued 10,000 shares of the Company's stock to the Foundation. *Id.* Neupert signed a stock certificate in the name of the Foundation. *See* PX 87; *see* BX 46. As discussed below, the evidence convinces me that the board resolution and stock certificate were not prepared until December 2016, at which point they were backdated to July 1.

32

not able to decide whether Lilly Perry should be the Sole shareholder of [the Company]."[116]

He then sent Olswang "extracts of the Delaware Commercial Registry showing that the LLC has been transformed into a Corporation."[117] He added: "[A]ll the shares are held by me as Executor of the Last Will (until the UK probate procedure has come to an end)."[118]

Monsenego questioned Neupert's claims:

You stated that you are starting with the probate procedure now. In other words, you have not currently been confirmed as executor of late Mr Perry. I simply do not have the information that would be required to mention you as the sole shareholder of the LLC. In addition, to mention you personally as shareholder of the LLC would contradict the declaration that Lilly Perry is the sole shareholder of the LLC which we already made to the French tax authorities for the purposes of the 3% tax. Should you insist to be mentioned as sole shareholder I would have to consult with beneficiaries.[119]

Neupert threatened Monsenego that if he filed a tax declaration listing Lilly or Tamar as the owner of the Company, "this will be considered as a criminal act."[120]

## J. Neupert And Naeff "Discover" The Deed Of Assignment.

Neupert believed that he could coerce Lilly into going along with the actions he had taken. On July 15, 2016, he summarized the plan in an email to Yael, Naeff, and other advisors in their faction: "We have to convince Lilly . . . that If [*sic*] she does not cooperate

---

[116] PX 86 at '620.

[117] PX 89 at '121.

[118] *Id.*

[119] PX 91 at '201.

[120] *Id.* at '200.

she might get the Assets (Bank Accounts in London, La Treille shares) minus Liabilities (NIS 69mio Class Action) but nothing from the [Letter of Wishes]."[121] At the evidentiary hearing, Lilly testified that Neupert had threatened to deprive her of any money from the Structure.[122]

On July 18, 2016, a lawyer representing Lilly and Tamar emailed Naeff, copying Neupert, to complain about Neupert's actions.[123] Naeff forwarded the letter to Hugo Sele, a lawyer who represented various entities in the Structure, and explained that Israel had owned the Company's equity when he died:

> Just for the sake of completeness. Until his death the settlor was the sole shareholder of Côte d'Azur LLC, Delaware, an entity that holds a property in France. At some point the plan was to bring this company into one of the trusts (and the [Letter of Wishes] also provided for that). Since France does its best (taxes, reporting etc.) to torpedo such structures, this idea was dismissed. As I see it, Côte d'Azur LLC is clearly part of the estate, and Dr. Neupert, as the executor, surely has the task of taking care of it. I don't see any reason for LOPAG to respond to [the lawyer's] (threatening) letter.[124]

---

[121] PX 92 at '564; *see also* PX 93 (email dated July 15, 2016, from Neupert to Giger and Naeff: "As far as you know, are there still other stocks (similar to Côte d'Azur) that IIP personally held and that are therefore [deemed to be] located in London . . . ? They will then of course go to Lilly – after all, she doesn't get anything else!"; translated from "gibt es Deines Wissens noch andere Aktien (ähnlich der Cote d'Azur) die IIP persönlich gehalten hat und die demnach als in London gelegen zu qualifizieren sind . . . ? Die gehen dann natürlich an Lilly - aber sie bekommt ja sonst nichts !").

[122] *See* Lilly Tr. 247 ("[H]e told me if I don't sign it, he was not going to give me any money.").

[123] *See* PX 94 at '557 (referring to letter).

[124] *Id.* at '554–55; *see also* Naeff Dep. 48 (identifying Hugo Sele).

Sele agreed that the Company's equity was part of the UK Estate, making Lilly and Tamar's objections an issue for Neupert rather than for Lopag and the Foundation.[125]

On August 5, 2016, Lilly and Tamar's attorney sent another letter to Neupert, threatening to hold him responsible for any damages resulting from "the transformation of the LLC in a Corp which you directed and your apprehension of the shares were made without power and without authorization."[126] Neupert conferred with Naeff and Sele about whether he could rely on the Letter of Wishes as a source of authority for his actions, but they agreed that it would not suffice.[127]

Without any other options, on the morning of August 10, 2016, Neupert asked Naeff about the Deed of Assignment.[128] Naeff told him that Israel had signed the Deed of Assignment, but that it had never been implemented because of the "consequences in France."[129] Neupert proposed to invoke it anyway.[130]

---

[125] PX 94 at '554 ("Agreed! As Lopag I would not react."); *accord* PX 101 at '494.

[126] PX 99 at '928.

[127] *See* PX 99 at '926–27.

[128] PX 103 at '617 ("Were the Cote d'Azur's holdings (shares) actually endowed by IIP to the structure [*sic*] or was that forgotten at the time – after all, we know in the meantime that a request in the [Letter of Wishes] cannot be interpreted as an endowment, with the result that the shares are today part of the official estate.").

[129] Naeff Tr. 171–72; *see* PX 103 at '617 ("IIP endowed the Cote d'Azur shares to the Foundation. Initially we had no access and later on we did not implement it due to the consequences in France.").

[130] *See* PX 98 at '971–72 (email from Neupert to Naeff and Sele: "This is great – I did seem to remember that I myself typed this [Deed of Assignment] in Tel Aviv (IIP's PC

35

Later that afternoon, Neupert emailed Yael and Gal Levita, an attorney for the Foundation.[131] His email read:

> Surprise - we just found the Original of the Assignment from May 2013 (I remember that I typed it myself, because IPs PC wanted to write from right to left)
>
> So the situation with the Delaware Corp is now clear:
>
> 1. The shares belong to the Foundation and I am acting as CEO (nothing to do with the Executor - Therefore not falling under the UK probate )
>
> 2. As the Foundation has no Protector the Trustee may act as they think fit
>
> 3. Based on the LoW wie [*sic*] might offer Lilly some sort of usufruct and

always wanted to type from right to left). We can now distinguish two phases: 1. The [Deed of Assignment], i.e. I will issue the shares and deliver them to you (and, based on a power of attorney [signed] by the Foundation, I will be able to act in the future). In France, nothing will change for the moment, since in the 3% declaration IIP [disclosed] himself as [ultimate beneficial owner] and we now provisionally declared Lilly. In the U.K. that means that the shares will definitely not fall under the probate. 2. Then it must only be [examined] whether we (as trustees and protectors) can take the responsibility for transferring the shares to the Liza Trust in accordance with the [Letter of Wishes] or whether they should formally remain with the Foundation because of tax implications. The new situation will surely be a main point in the negotiations with Yossi regarding the settlement!"; translated from "Das ist hervorragend – ich glaubte doch, mich zu erinnern, dass ich diese Widmung in Tel Aviv selber getippt hatte (der PC von IIP wollte doch immer von rechts nach links schreiben)[.] Wir können nun 2 Phasen unterscheiden: 1. Die Widmung von 2013, dh. Ich werde die Aktien ausstellen und Euch einliefern (und in Zukunft Aufgrund einer Vollmacht der Stiftung agieren können) In Frankreich ändert das im Moment nichts, da sich IIP ja in der 3% Erklärung als WB geoutet Hatte und wir nun provisorisch Lilly deklariert haben 2. Alsdann ist lediglich zu prüfen, ob wir es (als Trustees und Protektoren) verantworten koennen, die Aktien gemäss dem LoW an den Liza Trust zu übertragen oder ob sie wegen der Steuerkonsequenzen formell bei der Stiftung bleiben sollen Die neue Situation wird sicher in den Verhandlungen mit Yossi betreffend das Settlement Einen Hauptpunkt darstellen !"). Yossi represented Lilly in the negotiations. *See* BX 43 at '974; *see also* PX 92; PX 98.

[131] *See* Naeff Tr. 167.

continue to pay the Maintenance, if she fulfills the conditions of the settlement (to be renegotiated ) - such a Solution would also be in line with the French 3% Tax Declaration that Lilly is the Beneficiary

4. If the shares remain with the Foundation there will be no adverse Tax Consequences in France Until Lilly passes away

The beauty is that Yossi will immediately realize that Lilly may not expect any favours from Tami but only from Dominik - which will probably make her shift her loyalty to the Board of the Foundation (The Body that decides when she might use the property).[132]

Neupert copied Naeff on the email, and Naeff remained complicitly silent regarding Neupert's counterfactual claim that the Deed of Assignment had just been discovered. At the evidentiary hearing, Naeff could not explain why Neupert would claim they had just discovered the Deed of Assignment when Naeff had it in his possession since Israel signed it, and when Neupert and Naeff had discussed it repeatedly during the ensuing years.[133]

## K.    The Legal Opinion

To bolster their newly embraced claim that the Deed of Assignment had validly transferred the equity of the Company to the Foundation, Neupert and Naeff sought a legal

---

[132] PX 103. Sele questioned whether the transfer had been completed and whether Neupert could rely on it. *See* PX 98 at '970–71. Neupert took a pragmatic view. He did not think Lilly could afford to challenge the Deed of Assignment, because the litigation would be costly and uncertain and a successful challenge would mean that the equity would end up in the UK Estate, where it would be subject to the claims of Israel's creditors. *See* PX 98 at '969–70; *id.* at '967; *see also id.* at '970 ("What would be the result if the family were to prevail? Exactly what Tami wants to avoid, namely that her sister receives at least 25% of the shares as her property – and during the many years of litigation among the claimants (with many legal opinions regarding the law in the U.K., Delaware, Israel and France as well as conflict of law rules) the Foundation would rent the villa to third parties!!!").

[133] *See* Naeff Tr. 172–73.

opinion from Zeichner Ellman & Krause LLP ("ZEK"), a New York law firm with an office in Israel. Daniel Rubel, a partner at ZEK, led the team.

Michael Weiser, a Lopag employee, provided Rubel with a package of documents consisting of the Company's certificate of formation, its LLC agreement, the certificate of conversion, the certificate of incorporation, the purchase agreement for the Villa, and a power of attorney.[134] Weiser told the firm that Risse might possess other documents, but that "it is currently not advisable to contact [her] from a strategic perspective."[135] ZEK never received any of the many documents indicating that the Deed of Assignment was never implemented before Israel's death. ZEK also did not receive the French tax filings or the interactions regarding the Villa which evidenced that the Foundation's representatives at Lopag did not believe that the Foundation owned the Company's equity.

Notably, the package did not include minutes of a board meeting which supposedly took place on July 1, 2016, during which Neupert and his secretary purportedly acted as directors to issue shares of stock to the Foundation. It also did not include a stock certificate in the name of the Foundation that purportedly was signed on July 1.[136] The record convinces me that those documents were created in December 2016, then backdated in an effort to create a more persuasive paper trail.

---

[134] *See* PX 110 at '679.

[135] PX 107 at '715.

[136] *See* PX 87; BX 46.

As noted, the package of documents that Weiser provided included a power of attorney. The defendants claim that it was a power of attorney ostensibly dated February 5, 2016, in which the Foundation granted Neupert the authority to execute all legal acts "concerning Cote d'Azur Estate LLC/Corp., Delaware" (the "Foundation Power of Attorney").[137] The evidence convinces me that the power of attorney that Weiser provided was a different power of attorney that the Company granted to two agents in May 2001 to authorize them to acquire the Villa on the Company's behalf.[138] The evidence convinces me that Neupert and Naeff created the Foundation Power of Attorney in late September or October 2016, after Rubel identified a series of problems with Neupert's authority to act on behalf of the Company. Neupert and Naeff backdated the Foundation Power of Attorney to February to create the impression that the Foundation gave Neupert the authority to act.

Rubel did not believe that the documents Weiser provided would enable him to opine that the Deed of Assignment validly transferred the equity in the Company. After conferring with Neupert, Weiser falsely told Rubel that there were no additional

_____

[137] BX 40 (formatting altered). The Foundation Power of Attorney was dated "05.02.2016." BX 40. At the evidentiary hearing, Naeff testified that the date was written in European format and meant February 5, 2016. Naeff Tr. 95. A board resolution dated January 25, 2017, passed by Neupert and Tandler, refers to a power of attorney granted on May 2, 2016. PX 132 at '908. ZEK appears to have drafted the resolution and likely misinterpreted the date format. This decision concludes that the power of attorney was backdated, making the difference between February and May immaterial. In either event, the backdating provided a paper trail for the actions Neupert took in June and July 2016.

[138] *See* PX 2.

documents.[139] No one mentioned the documents that the Wiggin firm had prepared, the exchanges involving the French tax authorities, or the documents relating to the management of the Villa.[140]

> On August 31, 2016, Rubel asked Weiser a series of critical questions:
>
> [T]he LLC Agreement states that Israel Perry was the sole shareholder. Can you confirm that he remained the sole shareholder?
>
> A certificate of conversion you provided us lists Dieter Neupert as president. Do you have any documentation regarding his appointment?
>
> When were the assignment of shares registered with the books of the company?
>
> Was his estate involved at all with the assignment or registration?[141]

Weiser responded:

> Yes, Mr. Perry was the sole shareholder and remained the sole shareholder.
>
> To our knowledge, Mr. Neupert is the president of the company, however we do not have any further documents other than already provided to you.
>
> The assignment of shares was never registered in the books of the company, as the administering law firm filed bankruptcy.
>
> Could you please explain your questions regarding the involvement of Mr. Perry's estate in the assignment or registration?
>
> The assignment was signed before the demise of Mr. Perry, thus we can only answer your question after we receive your conclusion whether this

---

[139] *See* PX 110 at '678; PX 113 at '833.

[140] *See* Naeff Tr. 142–43.

[141] PX 113 at '832–33.

assignment was valid or not?[142]

Eighteen minutes later, Naeff forwarded the email exchange to Neupert and warned him that the validity of the assignment was "not clear."[143] Neupert responded that he had the power to effectuate the changes as the executor of Israel's estate (even though he was never appointed to that role). He suggested that "if necessary, we might still have to document" that he acted "on the basis of a power of attorney by the [Foundation]."[144] This appears to be the first appearance in the record to what became the Foundation Power of Attorney.

On September 2, 2016, after receiving Neupert's response to Naeff, Weiser asked Neupert whether he could represent to ZEK that Neupert had "acted as the executor" when converting the Company into a corporation.[145] Neupert agreed: "[Y]es, definitely – you can report this as stated (but keep it away from Tami since it would otherwise be inconsistent with my actions related to the [Deed of Assignment] (but as stated previously, this could be remedied with a power of attorney)."[146] Neupert did not reference a specific power of attorney. He spoke of a potential solution ("could be remedied"). If the Foundation Power of Attorney already existed, either Neupert or the Lopag representatives would have

---

[142] *Id.*

[143] *Id.* at '831.

[144] *Id.* at '830.

[145] *Id.*

[146] *Id.*

41

mentioned it.

Weiser did not take up the reference to a power of attorney. Instead, he promptly told Rubel that Neupert claimed authority to effectuate the conversion as the executor of Israel's estate.[147] In a follow-up email, Weiser told Rubel that Neupert agreed that he had never been appointed as a director or president of the Company and had only acted as executor of Israel's estate.[148]

On September 9, 2016, Rubel concluded that "Neupert did not have authority to sign the certificate of conversion dated March 2016 converting the LLC to a corporation" and that consequently the filing either needed to be ratified or cancelled.[149] Neupert was furious that ZEK was "questioning his authority."[150] Neupert told Naeff that the solution was for the Foundation "approve my actions retroactively."[151]

Frustrated that Rubel was not going along with his plan, Neupert contacted him directly, claiming there were "two phases" to his actions:

1. Phase I (before the Original of the Assignment was discovered)

    a) In my capacity as Executor / Trustee of the late Israel Perry all his

---

[147] PX 114 at '977 ("Neupert informed us that he was able to achieve the changes for [the Company] as executor of the estate.").

[148] *Id.* ("Neupert has never been appointed as President/Director of [the Company]. Mr. Neupert did act as executor based on a power of attorney. Thus, the previous information provided to you in this specific regard . . . was not correct.").

[149] PX 121.

[150] Naeff Tr. 177–78.

[151] PX 122 ("Since now everything belongs to [the Foundation], [the Foundation] has to approve my actions retroactively, which is no problem at all!").

membership Rights were automatically vested in me according to § 18-705 of the Delaware LLC Code (Code)

b) as there was already a draft on the table how the shares should be allocated among the heirs (Lilly 40 %, the daughters each 30 %) I had complete authority to convert the LLC into a Corporation and to become its Director

2. Phase II (After the Original Deed of Assignment was discovered)

a) according § 18-301 and 18-702/4 of the Code the Late Israel Perry lost his membership by assigning his entire interest to BGO Foundation (Ludwig Poltzer at the time ) and BGO became the Sole new Member

b) BGO Foundation has approved my actions by Special Power of Attorney and I recognized as Executor / Trustee of the Last Will that Cote d'Azur LLC (now Corp) belongs to BGO Foundation (by issuing the entire Share Capital to BGO)

So all you have to do is checking the quoted provisions in the Code and sign off my opinion - If you are not familiar with the Delaware precedents/ jurisprudence I suggest we ask a Collegue [*sic*] from Wilmington to give his opinion

The validity of the Assignment has become a rather urgent issue as the French Tax Adviser is not even copying me (as Director ) in but just acts on the instructions of Tami Perry - I have to replace him as soon as possible![152]

Neupert's description of the discovery of the Deed of Assignment was false. He and Naeff had known about it since 2013 and had discussed it in 2014 and 2015. This email marks the first time that anyone suggested to ZEK that the Foundation had authorized Neupert's actions with a power of attorney.

On September 12, 2016, Neupert spoke directly with Rubel.[153] Later that day, Rubel

---

[152] PX 123.

[153] *See id.*

emailed Naeff, Weiser, and Neupert about another problem with Neupert's story:

> [I]n Delaware, when a sole shareholder of an LLC assigns all of his shares, then he is no longer a member. However, the assignee cannot become a member of the LLC until his shares are registered, which did not occur here. There is a special analysis that may be applied to this type of situation. However, the analysis is further complicated by the filing of the certificate of conversion, its potential impact and the question of its validity.[154]

Neupert turned to a power of attorney as the solution: "If you think that there is a missing link in the chain of documents please tell us and we shall let you have . . . a PoA by BGO in my favour to convert the LLC into a Corp, become its Director and to issue a Share Certificate in favour of BGO."[155] Neupert again did not refer to a specific power of attorney. He was contemplating creating a document to fill in "a missing link in the chain."

Once again, the Lopag representatives did not back up Neupert's reference to a power of attorney. Naeff separately wrote Rubel to confirm that "Neupert is the Executor / Trustee of the late IIP."[156] Naeff's statement was false in its own right: Neupert had never been made executor of Israel's estate.

On October 31, 2016, Neupert asked Monsenego for the Company's tax-related documents, declaring that he was "chairman of the [Company]" and asserting that his

---

[154] PX 126 at '594.

[155] PX 124 at '578.

[156] PX 125 ("I confirm that Dr. Neupert is the Executor / Trustee of the late IIP and IIP was prior to the assignment dd 01.05.2013 the former sole owner of Cote D'Azur Real Estate. We are looking forward for a conclusive plan to bring all corporate documents in order. This is the basis for all further steps that have to be taken in FR and US.")

authority was "legitimized" by the Foundation.[157] Neupert attached the Deed of Assignment and the Foundation Power of Attorney. This is the first time the Foundation Power of Attorney appears in the record as part of a communication among the parties. Based on the contemporaneous documents, I find that Neupert and Naeff created the Foundation Power of Attorney after September 12 and before October 31. They backdated it to February 2, 2016, to make it appear that the Foundation had prospectively authorized the actions Neupert took in June.

On December 5, 2016, one of Neupert's secretaries contacted the Company's registered agent to request "a Corporation Kit . . . i.e., a seal of the company, the share certificates and the minutes Book or whatever."[158] By email dated December 28, another one of Neupert's secretaries, Tanja Tandler, sent him the share certificate and a draft set of minutes.[159] Tandler asked whether to sign the documents. Neupert told her to sign, then "affix the seal!"[160]

---

[157] PX 128 at '389–90.

[158] PX 130.

[159] PX 131 at '027 (Tandler: "Attached you will find, in addition to the copy of the share certificate, the minutes of the constituent board of directors' meeting, including the resolution to issue the share certificate. Regarding the by-laws: Did you receive from Delaware a CD with the documents (in addition to the Corporate Seal Machine, etc.) or shall I copy by hand the whole document of the by-laws of Cote d'Azure Estate Corp. which you have included with the little folder?").

[160] *Id.* at '026 (Neupert: "[N]o, we are going to sign the document as is (I inserted the name of the company) and affix the seal!").

The minutes purported to document a meeting that took place on July 1, 2016, during which Neupert and Tandler acted as the board of directors of the Company, appointed themselves as president and secretary, and issued all of the Company's shares to the Foundation.[161] The stock certificate reflected the Foundation's ownership of 10,000 shares of stock.[162] I find that these documents were drafted in December 2016 and backdated to July 1. At the evidentiary hearing, Naeff testified that he did not receive them until December 2016 and agreed it was "certainly odd" that they were dated July 1.[163]

On February 14, 2017, ZEK finally delivered its legal opinion. In a single, non-reasoned paragraph, it stated:

> COTE D'AZUR ESTATE LLC . . . was converted into the Corporation; BGO Foundation is the owner of all of the authorized and outstanding shares of the Corporation and can thereby exercise control of the Corporation; the duly elected directors of the Corporation are Dr. Dieter Neupert and Ms. Tanja Tandler; and the duly appointed officers of the Corporation are Dr. Neupert, President, [and] Ms. Tandler, Secretary . . . .[164]

Rubel did not sign the opinion. Another ZEK partner signed it.

## L. This Litigation

On April 14, 2017, Lilly filed this action against Neupert and the Company. She seeks a declaration that the conversion was invalid. Neupert and the Company answered

---

[161] *See* BX 46.

[162] *See* PX 87.

[163] Naeff Tr. 196–97.

[164] PX 150.

and asserted affirmative defenses in which they relied on the validity of the Deed of Assignment.

After Lilly filed this litigation, the Foundation commenced a lawsuit of its own in the Princely District Court of Lichtenstein. The Foundation's complaint named Lilly, Tamar, and Yael as defendants and sought a declaration that the Foundation owned the Company's equity based on the effectiveness of the Deed of Assignment.[165]

Recognizing that she needed to challenge the validity of the assignment of the Company's equity to the Foundation, Lilly moved to join the Foundation as an involuntary counterclaim plaintiff pursuant to Court of Chancery Rule 19.[166] By memorandum opinion dated December 6, 2017, I joined the Foundation as a relief defendant.[167] Once served, the Foundation moved to dismiss Lilly's complaint pursuant to Court of Chancery Rule 12(b)(2).[168]

## II.     LEGAL ANALYSIS

The Foundation contends that this court cannot exercise personal jurisdiction over it under the Delaware Long-Arm Statute.[169] Determining whether a Delaware court can

---

[165] *See* Dkt. 33 Exs. 4, 5.

[166] Dkt. 24.

[167] *Perry v. Neupert*, 2017 WL 6033498, at *1 (Del. Ch. Dec. 6, 2017).

[168] Dkt. 48.

[169] *See* 10 *Del. C.* § 3104.

47

exercise personal jurisdiction over a non-resident defendant under the Long-Arm Statute requires a two-step analysis.[170] In the first step, the court determines whether the plaintiff has satisfied the statutory requirements.[171] In the second step, the court determines whether exercising personal jurisdiction over the defendant passes muster under the Due Process Clause of the United States Constitution.[172] To satisfy due process, "'a nonresident defendant must have sufficient 'minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"[173]

The Delaware Supreme Court has adopted what is known as the conspiracy theory of jurisdiction.[174] Under this theory,

> a conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result

---

[170] *See Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012).

[171] *Id.*

[172] *Id.*

[173] *Id.* (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[174] *Id.*

48

of the conduct in furtherance of the conspiracy.[175]

The theory "is based on the legal principle that one conspirator's acts are attributable to the other conspirators."[176] Thus, "if the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court."[177]

The five elements of the conspiracy theory of jurisdiction functionally encompass both the statutory and constitutional prongs of the test for personal jurisdiction.[178] The first three elements of the *Istituto Bancario* test satisfy the statutory prong by covering the requisite elements the Long-Arm Statute. That statute provides for jurisdiction in circumstances that include the following:

> (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
>
> > (1) Transacts any business or performs any character of work or service in the State;

---

[175] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del. 1982).

[176] *Fläkt Woods*, 56 A.3d at 1027.

[177] *Istituto Bancario*, 449 A.2d at 222.

[178] *See iBio, Inc. v. Fraunhofer-Gesellschaft Zur Förderung der Angewandten Forschung E.V.*, 2018 WL 6493503, at *3 (Del. Ch. Dec. 10, 2018); *Perry*, 2017 WL 6033498, at *14; *Konstantino v. AngioScore, Inc.*, 2015 WL 5770582, at *6–7 (Del. Ch. Oct. 9, 2015); *Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *12 (Del. Ch. Feb. 11, 2015).

(2) Contracts to supply services or things in this State;

(3) Causes tortious injury in the State by an act or omission in this State . . . .[179]

Under the statute, "'a single transaction is sufficient to confer jurisdiction where the claim is based on that transaction.'"[180] Satisfying the third *Istituto Bancario* element—whether a "substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state"—therefore satisfies the statutory requirement that a party have transacted business in the state, performed work in the state, or caused tortious injury in the state through an act or omission in the state.

The Long-Arm Statute expressly recognizes that forum-directed activity can be accomplished "through an agent."[181] The first and second *Istituto Bancario* elements—the existence of a conspiracy and the defendant's membership in it—provide grounds for imputing the jurisdiction-conferring act to the non-resident defendant under agency principles, because "conspirators are considered agents for jurisdictional purposes."[182]

It remains true that the conspiracy theory itself is not an independent basis for

---

[179] 10 *Del. C.* § 3104(c)(1)–(3).

[180] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 978 (Del. Ch. 2000) (quoting *Kahn v. Lynch Commc'n Sys., Inc.*, 1989 WL 99800, at *4 (Del. Ch. Aug. 24, 1989)); *accord LaNuova D & B S.p.A. v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986).

[181] 10 *Del. C.* § 3104(c).

[182] *Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.*, 611 A.2d 476, 481 (Del. 1992); *accord Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *12 (Del. Ch. Nov. 21, 1995) (Allen, C.).

jurisdiction that alleviates the need to meet the statutory prerequisites of the Long-Arm Statute.[183] But the first, second, and third *Istituto Bancario* elements correspond sufficiently with the statutory requirements such that satisfying the former accomplishes the latter.

The same analytical overlap between the *Istituto Bancario* factors and the personal jurisdiction test exists for the constitutional dimension. The fourth and fifth *Istituto Bancario* elements—whether the defendant "knew or had reason to know of" the forum-directed activity and the degree to which the forum-directed activity was "a direct and foreseeable result of the conduct in furtherance of the conspiracy"—speak to due process and whether there are sufficient minimum contacts between the defendant and the forum such that the defendant could reasonably anticipate being sued there.[184]

> [A] defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws.[185]

The "participation is a substantial contact with the jurisdiction of a nature and quality that it is reasonable and fair to require the defendant to come and defend an action there."[186]

---

[183] *Hercules*, 611 A.2d at 482 n.6.

[184] *See Carlton Invs.*, 1995 WL 694397, at *12.

[185] *Istituto Bancario*, 449 A.2d at 225.

[186] *Id.*; *accord Hercules*, 611 A.2d at 482 n.6 (explaining that the conspiracy theory "provides a framework with which to analyze a foreign defendant's contacts with Delaware").

Consequently, if a plaintiff can address satisfactorily all five elements of the conspiracy theory, then the plaintiff will have met both prongs of the jurisdictional test. This decision therefore uses the conspiracy theory as the framework for analysis.

## A.      The Tortious Conspiracy

The first *Istituto Bancario* elements asks whether a tortious conspiracy existed.[187] The second *Istituto Bancario* elements asks whether the defendant was a member of that conspiracy.[188] Although *Istituto Bancario* literally speaks in terms of a "conspiracy to defraud," the principle is not limited to that particular tort.[189] In this case, the relevant torts are fraud and conversion.[190] Because the analysis of the conversion claim is sufficient to establish jurisdiction, this decision only addresses that tort.

---

[187] 449 A.2d at 225.

[188] *Id.*

[189] *See id.* at 222–25 (describing underlying theory without fraud-based limitation); *BrandRep, LLC v. Ruskey*, 2019 WL 117768, at *3 (Del. Ch. Jan. 7, 2019) (finding jurisdiction where allegations sufficiently implied conspiracy to misappropriate trade secrets); *iBio*, 2018 WL 6493503, at *3 (finding jurisdiction where allegations sufficiently implied conspiracy to misappropriate technology); *Dow Chem. Co. v. Organik Kimya Hldg. A.S.*, 2017 WL 4711931, at *11 (Del. Ch. Oct. 19, 2017) (finding jurisdiction where allegations sufficiently implied conspiracy to misappropriate trade secrets and technology); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 635-36 (Del. Ch. 2013) (noting that theory encompasses claims of breach of fiduciary duty and aiding and abetting), *abrogated on other grounds by El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016) (rejecting *Carsanaro*'s analysis of post-merger derivative standing); *Hamilton P'rs v. Englad*, 11 A.3d 1180, 1197 (Del. Ch. 2010) (same); *Crescent/Mach I*, 846 A.2d at 977 (rejecting construction of *Istituto Bancario* that would require a "specific allegation that [the defendants] agreed to conspire 'to defraud' minority stockholders").

[190] *See* Dkt. 1 ¶¶ 24–49, 40–43.

52

### 1. The Conspiracy To Convert The Company's Equity

Conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it."[191] Lilly has proven by a preponderance of the evidence that Neupert and the Foundation exercised dominion over the Company's equity in a manner inconsistent with Lilly's property rights.

First, Lilly proved that when Israel died, he personally owned the Company's equity. The overwhelming evidence on this point consists of:

- Contemporaneous evidence from May 2013 indicating that the Deed of Assignment should not be immediately effective because it would cause adverse tax consequences for the Foundation during the 2013 tax year.[192]

- Contemporaneous emails between July and December 2013 evidencing Naeff's unsuccessful efforts to complete the transfer of the Company's equity described in the Deed of Assignment.[193]

- Contemporaneous emails evidencing that Israel decided not to complete the transfer of the Company's equity described in the Deed of Assignment to avoid adverse tax consequences in France, including Naeff's email to that effect dated March 28, 2015, barely one week after Israel's death.[194]

- Naeff's testimony that when he wrote in his email dated March 28, 2015, that the Deed of Assignment "was never executed," he meant "that this transfer has not been

---

[191] *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933); *accord Arnold v. Soc. for Sav. Bancorp, Inc.*, 678 A.2d 533, 535–36 (Del. 1996).

[192] *See* BX 5.

[193] *See* BX 13; BX 14; BX 16; BX 20; BX 23; PX 8; PX 11.

[194] *See* BX 26; PX 27; PX 25 at '73; PX 94; PX 103; Neff Tr. 171–72.

completed or finalized."[195]

- Naeff's chart of the Structure in 2015 which reflected that the Company's equity was part of the UK Estate.[196]

- Contemporaneous emails from 2015 and 2016 in which Lopag representatives advised Lilly that she was responsible for the expenses and upkeep of the Villa because the Foundation did not own the equity of the Company; rather it had passed to the UK Estate.[197]

- Contemporaneous emails from 2015 and 2016 in which Naeff, Neupert, and others advised the Company's tax counsel in France that Israel had owned the Company's equity when he died and that the Foundation had not owned it.[198]

- Representations that Neupert made for the Company's tax counsel to use in responding to an audit by the French tax authorities in which Neupert confirmed that Israel was the sole owner of the Company's equity from the formation of the Company until his death.[199]

- Neupert's insistence during a dispute with Tamar that the Company's equity was part of the UK Estate.[200]

Because Israel personally owned the equity when he died, it passed to the UK Estate. As Israel's sole heir under his will, Lilly had a beneficial interest in the property belonging to the UK Estate (subject to the claims of the UK Estate's creditors).

---

[195] Naeff Tr. 53.

[196] *See* PX 20 at '151–52; PX 21 at '033.

[197] *See* BX 27; PX 14 at '645; PX 23; PX 26; PX 37; PX 38; PX 99 at '928.

[198] BX 33 at '302 (email dated October 20, 2015, from Naeff to Olswang: "IIP was the sole shareholder of Cote D'Azur Estates LLC until his demise in March 2015."); *accord* PX 32; PX 43.

[199] *See* PX 69; PX 70; BX 43 at '974; *see also* PX 59; PX 60; PX 63.

[200] *See* PX 68; PX 73; PX 119

54

To the exclusion of Lilly's ownership interest as a beneficiary of the UK Estate, the defendants maintain that the Foundation owns the Company's equity. Neupert asserted dominion over the Company's equity by converting the Company into a corporation and purporting to issue all of its shares to the Foundation. Those acts constituted wrongful conversion because Neupert had no authority to take them. The Foundation's assertion of ownership constitutes wrongful dominion because it has no valid basis for its claim. Lilly has proven by a preponderance of the evidence that Neupert and the Foundation conspired to deprive her of her beneficial interest in the Company's equity, thereby engaging in the tort of conversion.

The conspiracy between Neupert and the Foundation began because they did not want the Company's equity to become part of the UK Estate, which would make it subject to the claims of Israel's creditors and trigger significant tax liabilities. To avoid this result, Neupert and Naeff schemed about how to make it appear that the Company's equity had been transferred into the Structure before Israel died. They decided to claim that the Deed of Assignment had been implemented, then allocate the ownership of the Company among Israel's heirs according to a settlement they would broker. Moving the Company's equity outside of the UK Estate would evade the claims of Israel's creditors, and any resulting allocation among the family could be structured to be tax efficient.

To give them the authority to re-paper the Company's ownership, Neupert concluded that they should convert the Company into a Delaware corporation, establish a new board that Neupert would control (it ended up being Neupert and one of his secretaries), and appoint Neupert as President. Neupert then would use his authority at the

board and officer levels to take the corporate actions necessary to implement the settlement among Israel's heirs. At the evidentiary hearing, Naeff testified that Neupert wanted to convert the Company to facilitate transferring the entity's equity, and I agree that the greater ease with which that could be accomplished was one advantage of the conversion.[201] But the evidence convinces me that the real benefit of these machinations was to manufacture a chain of transactions that would obscure Israel's ownership of the Company's equity at the time of his death.[202] Once the Company had been converted into a corporation and new papers drafted, anyone inquiring about an entity's ownership stake could be provided with share certificates and board resolutions, resulting in a seemingly clean claim of title. To determine the real facts, a regulator or other interested party would have to dig into the Company's history and obtain internal documents. The corporate conversion and subsequent transactions would operate as a form of ownership laundering.

---

[201] Naeff Tr. 95–96. Neupert and Naeff clearly understood that it was possible to transfer the equity of an LLC. After all, they had been getting ready to transfer the equity in 2013, before Israel's death, until Israel decided not to complete the transaction because of adverse tax consequences in France. Admittedly, it is relatively easier to transfer shares than LLC interests. Neupert also may have thought that the language of the Company's LLC agreement, which described Israel as the sole member and owner of 100% of the equity, precluded the transfers if Israel did not approve them himself, or at least raised a question as to their validity. Converting the Company into a corporation with a certificate of incorporation that did not contain similar restrictions would mitigate that risk.

[202] *See* PX 25 at '059 (email from Naeff discussing the need to "issue new shares" to the Foundation); *id.* at '060 (email from Naeff explaining that "formally, we now know how changes of directors and shareholders work in Delaware and we could prepare the documents"); *cf.* PX 28 at '672 (Naeff discussing the option of splitting the ownership of the Company between the heirs); PX 30 at '160 (Lopag memorandum discussing same).

56

To put himself in a position to take these steps, Neupert falsely represented to a registered agent in Delaware that he had authority to act on behalf of the Company because he was the executor of Israel's estate. In reality, Neupert never received authority to act in that role. Evidencing his knowledge of this fact, Neupert bragged to Naeff and other advisors that he successfully misled the registered agent:

> [A]s I do not have the grant of authorization from the British Probate Court, the only way around was to convince the new registered agent in Delaware, The Company Corporation, that I am the Executor of the Last Will and therefore the legitimate new Director of Cote d'Azur (fortunately in Delaware they do not know anything about UK probate procedure).[203]

But to mitigate the legal risk he faced, Neupert sought to have Lilly sign a resolution in her capacity as the Company's sole member (a role she did not yet hold because of the probate proceedings). That resolution would have purported to appoint Neupert to the position of manager, ostensibly giving him authority to act.[204]

Unfortunately for Neupert, Lilly and Tamar refused to accept the proposed settlement, and Lilly would not participate in Neupert's scheme to launder the Company's ownership. The breakdown of the settlement negotiations caused Israel's heirs and former advisors to split into two factions, with Neupert and Naeff opposing Lilly and Tamar.

Neupert responded by seizing control of the Company. On June 30, 2016, Neupert

---

[203] PX 53 at '472.

[204] The resolution could not have had that effect because Company was a member-managed LLC. *See* PX 1 § 21. As a result, the resolution could not have appointed Neupert to a non-existent position of manager.

57

caused a certificate of conversion to be filed with the Delaware Secretary of State that converted the Company from an LLC into a corporation.[205] He also caused a certificate of incorporation for the Company to be filed that authorized the issuance of up to 10,000 shares of common stock.[206]

Neupert believed that he and his faction could coerce Lilly into accepting the new state of affairs. He told his confederates, including Naeff and two other Lopag principals, that if Lilly did not accept what he had done, he would ensure that she did not receive any money from the Structure.[207] She might receive whatever remained in the UK Estate after probate, including the Company's equity if she could prove that Neupert's actions were unauthorized, but that might be little or nothing depending on the claims of Israel's creditors.[208]

Contrary to Neupert's expectations, Lilly did not back down and refused to ratify his actions. Lilly's refusal forced Neupert to try to come up with another source of authority to justify what he had done. He could not rely on any authority conferred by the role of executor of the UK Estate, because he had never been appointed to that role. He consulted with Naeff and Sele about the Letter of Wishes, but they agreed that it did not have any

---

[205] BX 61 ¶ 28.

[206] BX 61 ¶ 30.

[207] *See* PX 92; PX 93; Lilly Tr. 247; *see also* PX 98 at '967, '969–70.

[208] *See* PX 92; PX 93.

legal force.[209] With no other options, they returned to the Deed of Assignment, claiming falsely to those not in the know that they had just discovered it.[210]

Recognizing that their claims about the Deed of Assignment were counter-factual and legally debatable,[211] Neupert and Naeff sought to obtain a legal opinion regarding the Foundation's ownership of the Company's shares. With Naeff and Neupert coordinating matters behind the scenes, a representative of Lopag (Weiser) provided ZEK with a package of documents consisting of the Company's certificate of formation, its LLC agreement, the certificate of conversion, the certificate of incorporation, and documents relating to the original purchase of the Villa in 2001, including a power of attorney that was used in connection with the purchase. Weiser did not provide ZEK with the many contemporaneous documents indicating that Israel decided not to complete the assignment for tax reasons. Weiser told ZEK that Risse might possess other documents, but instructed that it was "not advisable to contact [her] from a strategic perspective."[212] By giving ZEK an incomplete and misleading package of documents, Weiser, Neupert, and Naeff fraudulently misled ZEK.

The lead attorney at ZEK (Rubel) did not believe that the documents would support

---

[209] *See* PX 99 at '926–27.

[210] PX 103; *accord* PX 98 at '970–71.

[211] *See* PX 98 (debate among Neupert, Naeff, and Sele about whether the Foundation could rely on the Deed of Assignment).

[212] PX 107 at '715.

an opinion. After conferring with Neupert, Weiser told Rubel that there were no additional documents.[213] That was false. Then, when Rubel continued to resist rendering the opinion,[214] Neupert intervened, telling Rubel that he had authority to act as executor of the UK Estate (which was false) and that the Foundation had approved his actions by executing the Foundation Power of Attorney (a document no one had previously mentioned or produced).[215] Naeff chimed in and attempted to support Neupert by reiterating (falsely) that Neupert was the executor of the UK Estate.[216] As discussed in the Factual Background, the evidence convinces me that during late September or early October 2016, Naeff and Neupert fabricated the Foundation Power of Attorney and backdated it to February 5, 2016.

In this litigation, Lilly initially stipulated that the Foundation Power of Attorney was executed on February 5, 2016.[217] That stipulation is so contrary to the weight of the evidence that I will not hold Lilly to it. "A stipulation is, in effect, an agreement or admission made in a judicial proceeding by the parties thereto in respect to s[o]me matter incident to the proceeding for the purpose of avoiding delay, trouble, and expense."[218]

---

[213] *See* PX 110 at '678; PX 113 at '833.

[214] PX 113 at '832; PX 121.

[215] *See* PX 124 at '578; PX 126 at '594;

[216] PX 125.

[217] Stip. ¶ 27.

[218] *In re Wilmington Suburban Water Corp.*, 203 A.2d 817, 832 (Del. Super. 1964), *aff'd in part and rev'd in part on other grounds*, 211 A.2d 602 (Del. 1965).

> Private stipulations are to be favored and should not be lightly set aside. . . . However, a court has the inherent power to avoid a stipulation in law or equity.

> Courts have broad discretion in determining whether to hold a party to a stipulation and may set aside a stipulation where enforcement would not be conducive to justice. . . . [A] trial court may, in the exercise of judicial discretion, upon proper cause shown, relieve a party from a stipulation entered into in the course of a judicial proceeding when it appears that such relief is necessary to prevent manifest injustice to the parties seeking it and that the granting of such relief will not place the adverse party at any disadvantage by reason of having acted in reliance upon the stipulation.[219]

The "manifest injustice" standard comes from a Federal Rule of Civil Procedure, which provides that a "court may modify [a pretrial order] only to prevent manifest injustice."[220] There is no Court of Chancery analogue to Federal Rule 16(e), but the law of the case doctrine points in the same direction and permits a court to revisit an interlocutory ruling if good cause exists.[221]

---

[219] 73 AM. JUR. 2d *Stipulations* § 12, WestLaw (database updated Jan. 2019) (footnotes omitted).

[220] Fed. R. Civ. P. 16(e); *see* 73 AM. JUR. 2d *Stipulations* § 12 n.8.

[221] *See Zirn v. VLI Corp.*, 1994 WL 548938, at *2 (Del. Ch. Sept. 23, 1994) (Allen, C.) ("Once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears."); *Siegman v. Columbia Pictures Entm't, Inc.*, 1993 WL 10969, at *3 (Del. Ch. Jan. 15, 1993) ("Prejudgment orders remain interlocutory and can be reconsidered at any time, but efficient disposition of the case demands that each stage of the litigation build on the last, and not afford an opportunity to reargue every previous ruling." (internal quotation marks omitted)). Court of Chancery Rule 54(b) recognizes that an interlocutory order "is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of the parties." The rule does not identify a standard for determining when it would be warranted to revise an earlier interlocutory order. The law-of-the-case doctrine fills the gap.

61

In this case, good cause exists. Lilly entered into the stipulation on May 4, 2018, before receiving documents that were subject to a motion to compel.[222] After Lilly prevailed on the motion, the defendants produced their communications with ZEK. Those documents provided compelling evidence that the Foundation and Neupert created the Foundation Power of Attorney in late September or early October 2016, then backdated it in an effort to retroactively validate Neupert's actions. Before obtaining those documents, Lilly had no basis to question the date of the Foundation Power of Attorney. After the defendants produced the documents, both sides proceeded as if the stipulation was no longer dispositive. Lilly argued that the Foundation and Neupert backdated the Foundation Power of Attorney,[223] and Lilly's counsel questioned Naeff extensively on this subject at the evidentiary hearing.[224] The defendants responded on the merits.[225] In my view, it would result in manifest injustice to hold Lilly to a stipulation she made when the defendants were withholding material information from production, where the parties subsequently treated the issue as an open point for the court to resolve.

Lilly established that Naeff and other Lopag representatives, acting on behalf of the Foundation, were deep in the mix of a conspiracy to convert the Company's equity. They participated as equal partners with Neupert and provided him with substantial assistance.

---

[222] *Compare* Stip. *with* Dkt. 174 at 39–48.

[223] *See* Dkt. 180 at 42–46; Dkt. 184 Ex. B at 42–48.

[224] *See* Naeff Tr. 149–51, 155, 161, 180, 183–84, 187, 191–94.

[225] *See* Dkt. 182 at 6–7, 31–33.

Lilly established the first and second elements of the *Istituto Bancario* test.

## 2. The Deed Of Assignment Was Ineffective.

The Foundation contends that it could not have conspired with Neupert to deprive Lilly of any ownership interest because the Deed of Assignment validly transferred ownership of the Company's equity to the Foundation in May 2013. That contention is contrary to the weight of the evidence, which establishes that the transfer was not completed before Israel's death. The Foundation responds that although everyone may have believed that the equity was not transferred, the Deed of Assignment was effective when signed as a matter of Delaware law. That is incorrect, both under the law governing donative gifts and under the Delaware Limited Liability Company Act (the "LLC Act").

### a. The Law of Gifts

The transfer of equity contemplated by the Deed of Assignment lacked consideration, making it a gift.[226] "As a general rule a gift must be executed (a) by the donor's complete and unconditional delivery of the property that is the subject of the gift and (b) by the donee's acceptance of the gift."[227] Although Lilly bore the burden of proving the facts necessary to support jurisdiction over the Foundation, the Foundation as "[t]he donee has the burden of establishing, by clear and convincing evidence, all facts essential

---

[226] *See* Naeff Tr. 221 (agreeing that the transfer lacked consideration).

[227] *Hudak v. Procek*, 806 A.2d 140, 150–51 (Del. 2002); *see* RESTATEMENT (THIRD) OF PROPERTY: WILLS AND OTHER DONATIVE TRANSFERS § 6.1 (Am. Law Inst. 2003) [hereinafter *Restatement*] ("To make a gift of property, the donor must transfer an ownership interest to the donee without consideration and with donative intent.").

to the validity of the purported gift."[228]

The Restatement (Third) of Property recognizes two ways to execute a transfer of personal property that will perfect a gift: (1) by delivering the property to the donee, or (2) by *inter vivos* donative document.[229] In each case, the evidence must establish "an act of finality" that demonstrates the passing of title from donor to donee.[230] Until the gift is completed, the donor may revoke it.[231]

The evidence does not prove that Israel delivered the Company's equity to the Foundation. Delivery requires an irrevocable transfer of "dominion and control over the property."[232] If "anything remains to be done to accomplish the gift, the transaction

---

[228] *Estate of Reed*, 2015 WL 1778073, at *3; *see In re Estate of Smith*, 1986 WL 4873, at *4 (Del. Ch. Apr. 24, 1986) (Allen, C.) (placing the burden of proof on the donee). *See generally* 38A C.J.S. *Gifts* § 83, WestLaw (database updated Feb. 2019) ("The person asserting the gift must prove all the essential elements by clear, direct, positive, express, and unambiguous evidence, or by clear and convincing evidence." (footnotes omitted)). "This burden arises out of the rebuttable presumption, often seen in the context of resulting trusts, that a purchaser of property intends that purchase property to inure to her own benefit." *Estate of Reed*, 2015 WL 1778073, at *3; *see Adams v. Jankouskas*, 452 A.2d 148, 152 (Del. 1982) ("In imposing a resulting trust, the court presumes, absent contrary evidence, that the person supplying the purchase money for property intends that its purchase will inure to his benefit, and the fact that title is in the name of another is for some incidental reason.").

[229] *Restatement*, *supra*, § 6.2.

[230] *Id.* cmt. b ("The 'wrench' of delivery impresses on the donor that he or she has engaged in an act of finality.").

[231] *See* 38A C.J.S. *Gifts* § 67, WestLaw (database updated Feb. 2019); *see generally Highfield v. Equitable Tr. Co.*, 155 A. 724, 726 (Del. 1931).

[232] *Hudak*, 806 A.2d at 151.

constitutes merely an executory agreement to give, and the title to the property does not pass."[233] Except for the Deed of Assignment itself, there is no evidence that Israel delivered the Company's equity to the Foundation. Israel did not deliver a membership interest certificate in his own name to the Foundation and endorse it in favor of the Foundation. Before Israel's death, no membership certificate was issued in the Foundation's name. Actual delivery never occurred.

The evidence does not prove that the Deed of Assignment was an *inter vivos* donative document that was intended to effectuate an immediate transfer. The contemporaneous communications show that Israel and his advisors did not intend for the Deed of Assignment to transfer the equity immediately upon its execution on May 1, 2013, because they understood that the transfer would have adverse tax consequences for the Foundation during the 2013 tax year.[234] Instead, they wanted the transfer to take place after June 15, 2013. Consequently, beginning in June 2013, Naeff sought to take the additional steps necessary to effectuate the transfer, which he understood involved additional legal documentation.[235] The numerous communications involving Naeff and Risse evidence their efforts to create that documentation and their belief that the transfer had not yet occurred. In October 2013, the Wiggin firm was hired to prepare a set of documents to

---

[233] *Id.*

[234] *See* BX 5.

[235] *See, e.g.*, BX 14 at '387; BX 23.

implement the transfer, but they were never executed.

The evidence proves that Israel decided to revoke the inchoate transfer contemplated by the Deed of Assignment. In December 2013, Risse asked Israel to sign off on the transfer. Subsequent documents establish that Israel decided not to proceed because the transfer would have adverse consequences in France.[236]

Under the law governing gifts, the transfer contemplated by the Deed of Assignment was never completed. After the Wiggin firm prepared documents that would have completed it, Israel decided not to proceed, revoking his gift. The member interests in the Company were never transferred to the Foundation.

### b.    The LLC Act

Assuming counterfactually that Israel intended for the Deed of Assignment to effectuate an immediate transfer, the governing provisions of the LLC Act foreclose the possibility that the Foundation became a member as a result of that document. At most, the Foundation would have become an assignee, and the Company would have dissolved because it lacked any members.

Section 18-702(b) of the LLC Act governs the assignment of an LLC interest in an LLC. In May 2013, when Israel signed the Deed of Assignment, Section 18-702(b) stated:

> Unless otherwise provided in a limited liability company agreement:
>
> (1) An assignment of a limited liability company interest does not entitle the assignee to become or to exercise any rights or powers of a member;
>
> (2) An assignment of a limited liability company interest entitles the assignee

---

[236] *See* PX 27; *see also* PX 25 at '058; BX 26.

to share in such profits and losses, to receive such distribution or distributions, and to receive such allocation of income, gain, loss, deduction, or credit or similar item to which the assignor was entitled, to the extent assigned; and

(3) A member ceases to be a member and to have the power to exercise any rights or powers of a member upon assignment of all of the member's limited liability company interest. . . . [237]

This provision established the default rule that applied unless the operative limited liability company agreement stated otherwise. The Company's LLC agreement did not state otherwise.[238] To the contrary, it stated: "Mr. Israel Perry (the "Member") is the sole member of the Company."[239] If anything, this language implied that Israel could not assign his member interest without amending the LLC agreement, which never occurred.[240]

Under Section 18-702(b), if Israel had intended to assign his membership interest in the Company to the Foundation effective immediately (an assumption that is contrary to the evidence), then the Foundation would have become an assignee. To become a member, the Foundation would have to be admitted to the LLC. Section 18-101(11) of the LLC Act defines a "[m]ember" as "a person who is admitted to a limited liability company as a

---

[237] 6 *Del C.* § 18-702(b) (2013).

[238] *See* PX 1.

[239] *Id.* § 2.

[240] As noted, the existence of this provision may well have contributed to Neupert's belief that he needed to convert the LLC into a corporation before transferring equity interests to entities in the Structure.

member as provided in § 18-301 of this title."[241]

Section 18-301, entitled "Admission of members," identifies a variety of means by which a person can become a member. Subsection 18-301(b) states:

> After the formation of a limited liability company, a person is admitted as a member of the limited liability company:
>
> . . .
>
> (2) In the case of an assignee of a limited liability company interest, as provided in § 18-704(a) of this title and at the time provided in and upon compliance with the limited liability company agreement or, if the limited liability company does not so provide, when any such person's permitted admission is reflected in the records of the limited liability company . . . .[242]

As with Section 18-702(b), Section 18-301 defers in the first instance to the operative LLC agreement. The Company's LLC agreement did not address the admission of new members, so the default rule applies.[243]

Section 18-301(b) distinguishes between (i) the act of admitting an assignee as a member and (ii) the point when the admission becomes effective. Initially, the assignee must be admitted "as provided in § 18-704(a)." Once this happens, the admission takes effect "at the time provided on and upon compliance with the limited liability company agreement." If the operative LLC agreement is silent, then the admission becomes effective when "such person's permitted admission is reflected in the records of the limited liability

---

[241] 6 *Del. C.* § 18-101(11).

[242] *Id.* § 18-301(b)(2).

[243] *See* PX 1.

company."

In May 2013, when Israel signed the Deed of Assignment, Section 18-704(a) identified two possibilities for a permitted admission:

An assignee of a limited liability company interest may become a member:

(1) As provided in the limited liability company agreement; or

(2) Unless otherwise provided in the limited liability company agreement, upon the affirmative vote or written consent of all of the members of the limited liability company.[244]

Because membership ceases upon assignment of the member's interest in the LLC, Section 18-704(a) created a unique requirement for single-member LLCs. Lacking an existing member who could consent to the admission of an assignee, the assignee only could be admitted to a single-member LLC if the LLC agreement contained a clause providing for automatic admission.[245] Without this clause, an assignment of a member interest in a single-member LLC would result in an LLC that had no members. Under Section 18-801(a)(4) of the LLC Act, "[a] limited liability company is dissolved and its affairs shall be wound up [if] . . . [a]t any time there are no members . . . ."[246] The transfer of the sole member's interest in a single-member LLC with an LLC agreement that lacked an

---

[244] 6 *Del. C.* § 18-704(a) (2013).

[245] *See* Practical Law Corporate & Securities, *2016 Amendments to Delaware Corporate and Alternative-Entity Statutes Signed into Law*, WestLaw (June 24, 2016); *see also Single-Member LLC Entity Member Form*, 69 Bus. Law. 745, 763–64 (2014) (containing a clause that automatically and simultaneously admits an assignee as a member of the limited liability company).

[246] 6 *Del. C.* § 18-801(a)(4).

automatic admission clause thus would result in the dissolution of the LLC.

In 2016, the General Assembly addressed this trap for the unwary by amending section 18-301(b) to provide as follows:

An assignee of a limited liability company interest may become a member:

. . .

(3) Unless otherwise provided in the limited liability company agreement by a specific reference to this subsection or otherwise provided in connection with the assignment, upon the voluntary assignment by the sole member of the limited liability company of all of the limited liability company interests in the limited liability company to a single assignee. An assignment will be voluntary for purposes of this subsection if it is consented to by the member at the time of the assignment and is not effected by foreclosure or other similar legal process.[247]

After this amendment, the sole assignee of the entire member interest in a single-member LLC becomes a "permitted admission" by virtue of the assignment. This provision was not operative in May 2013. Moreover, the General Assembly did not revise Section 18-301(b)(2), which explains that admission takes effect only "at the time provided on and upon compliance with the limited liability company agreement or . . . when any such person's permitted admission is reflected in the records of the limited liability company." The timing of the admission still depends on updating the LLCs records.

The Foundation argues that Section 18-704(a)(3) should apply retroactively to validate the immediate transfer that the Deed of Assignment allegedly effectuated three years before. Applying the statute retroactively would break with the "time-honored

---

[247] *Id.* § 18-704(a)(3).

principle that [Delaware courts] 'will not infer an intention to make an act retrospective,' and that 'to give an act a retrospective operation would be contrary to the well settled principles of law applicable to the construction of statutes unless it be plainly and unmistakably so provided by the statute.'"[248] The General Assembly specified that the amendment would become effective on August 1, 2016.[249] There is no indication that it would apply retroactively.[250] Moreover, compliance with Section 18-704(a) only would grant the Foundation the status of "permitted admission." To effect an admission, there would still need to be a document reflecting the admission of the Foundation on the Company's records. There is no such document.

For purposes of this case, if the Deed of Assignment had validly effected an assignment of all of Israel's member interest immediately upon execution (an assumption contrary to the evidence), then the transfer would have resulted in the Company having no members and triggered its dissolution. At that point, dissolution would have occurred unless the last remaining member of the LLC appointed a new member within ninety days

---

[248] *Chrysler Corp. v. State*, 457 A.2d 345, 351 (Del. 1983) (quoting *Keller v. Wilson & Co.*, 190 A. 115, 125 (Del. 1936)).

[249] *See* Del. H.B. 372, 148th Gen. Assem. §11 (2016) ("This Act shall become effective August 1, 2016.").

[250] The amendment did apply to all Delaware LLCs, even those formed before the amendment, and it governed their affairs from the effective date forward. *See Total Hldgs. USA, Inc. v. Curran Composites, Inc.*, 999 A.2d 873, 878 (Del. Ch. 2009) (Strine, V.C.). That is different from retroactively applying a statute to alter the effect of past acts.

of assigning the interest, which Israel did not do.[251]

Facing this result, the Foundation argues that the Company could not have dissolved pursuant to Section 18-801(a)(4) because the Company's LLC agreement contained a dissolution provision that stated: "The Company shall dissolve and its affairs shall be wound up at such time, if any, as the Member may elect. No other event (except an entry of a decree of judicial dissolution under § 18-802 of the Act) will cause the Company to dissolve."[252] That language is not sufficient to displace the dissolution trigger in Section 18-801(a)(4), which does not state that it can be varied by an LLC agreement.[253] By definition an LLC must have one or more members.[254] Without any members, the LLC dissolves.

Under the LLC Act, the Deed of Assignment could not have resulted in the Foundation becoming the sole member of the Company on May 1, 2013, when the Deed of Assignment was executed. If the Deed of Assignment had purported to transfer Israel's

---

[251] *See* 6 *Del. C.* § 18-801(a)(4) ("provided, that the limited liability company is not dissolved and is not required to be wound up if: a. Unless otherwise provided in a limited liability company agreement, within 90 days or such other period as is provided for in the limited liability company agreement after the occurrence of the event that terminated the continued membership of the last remaining member, the personal representative of the last remaining member agrees in writing to continue the limited liability company and to the admission of the personal representative of such member or its nominee or designee to the limited liability company as a member, effective as of the occurrence of the event that terminated the continued membership of the last remaining member . . . .").

[252] PX 1 § 15.

[253] *Compare* 6 *Del. C.* § 18-801(a)(4) *with id.* §§ 18-801(a)(1), (3).

[254] *Id.* § 18-101(6).

interest immediately, then it would have resulted in the Foundation becoming an assignee and the Company dissolving. As a matter of law, the Deed of Assignment could not have achieved the result that the defendants claim.

### 3. The Foundation Benefitted.

In an odd line of reasoning, the Foundation contends that even if it never had any right to the Company's equity, the conversion was not tortious because the Foundation did not receive any benefit. This argument fails on the law and the facts.

As a legal matter, a party does not need to benefit to face a remedy for the tort of conversion. The Delaware Supreme Court explained in 1933 that "the property alleged to have been converted" does not necessarily need to be "applied to the use of the defendant."[255]

Regardless, as a factual matter, the Foundation did benefit. Before the conversion, it did not own the equity of the Company and did not beneficially own a French villa worth millions of dollars. After the conversion, it did. Neupert even suggested that the Foundation could generate income during the pendency of this dispute by renting out the Villa.[256]

## B. The Forum-Related Acts

The third *Istituto Bancario* element asks whether "a substantial act or substantial

---

[255] *Drug*, 168 A. at 354.

[256] *See* PX 98.

effect in furtherance of the conspiracy occurred in the forum state."[257] Filing a corporate instrument in Delaware to facilitate the challenged transaction satisfies this element.[258]

The record plainly reflects that Neupert engaged in Delaware-directed activity sufficient to satisfy the third *Istituto Bancario* element and provide the statutory prerequisite for jurisdiction under the Long-Arm Statute. Neupert signed the certificate of conversion and caused it to be filed with the Delaware Secretary of State, representing falsely that he was President of the Company. This act converted the Company from an LLC to a corporation. Neupert next caused the filing of a certificate of incorporation for the Company that authorized the issuance of up to 10,000 shares of common stock, again representing falsely that he was President of the Company.[259]

The Delaware-directed acts were an important part of the conspiracy. Using the authority ostensibly provided by these certificates, Neupert asserted to Lilly that he had

---

[257] 449 A.2d at 225.

[258] *E.g.*, *Fläkt Woods*, 56 A.3d at 1027 (filing certificate of cancellation); *Carsanaro*, 65 A.3d at 635 (filing various certificates required by DGCL for challenged transactions, including certificates of amendment, certificates of designation, certificates of correction, and certificate of cancellation); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at *8 (Del. Ch. Feb. 4, 2005) (filing certificate of designations); *Gibralt Capital Corp. v. Smith*, 2001 WL 647837, at *6 (Del. Ch. May 9, 2001) (filing certificate of designations); *Crescent/Mach I*, 846 A.2d at 977 (filing certificate of merger). *See generally* 1 R. Franklin Balotti & Jesse A. Finkelstein, THE DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 13.4[B], at 13-13 (3d ed. 2014) ("The filing of corporate instruments with the Delaware Secretary of State may also constitute an action in Delaware sufficient to support jurisdiction.").

[259] *See* PX 87.

deprived her of her interest in the Company's equity in her capacity as a beneficiary of the UK Estate. He threatened that if she did not go along with his actions, then he would ensure that she did not receive any money from the Structure. Neupert and the Foundation also relied on the certificates when securing a legal opinion that the Foundation owned all of the Company's equity.

## C.     The Foundation's Knowledge Of The Forum-Related Acts

The fourth and fifth *Istituto Bancario* elements evaluate whether "the defendant knew or had reason to know of the act in the forum state" and the degree to which "the act in . . . the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy."[260] In substance, these elements require evidence "from which one can infer that a foreign defendant knew or should have known that the conspiracy would have a Delaware nexus."[261] Actual knowledge is not required; "the applicable standard is whether the foreign [defendant] knew or should have known [about the] activity in Delaware."[262]

At the evidentiary hearing, Naeff repeatedly attempted to distinguish Neupert's words and actions from his own.[263] The factual record indicates otherwise. Naeff and Neupert worked together, and Neupert acted with the Foundation's support and consent.

---

[260] 449 A.2d at 225.

[261] *Fläkt Woods*, 56 A.3d at 1024.

[262] *Id.*

[263] *See, e.g.*, Naeff Tr. 180.

In August 2015, Neupert and Naeff began discussing how to appoint a director who could sign documents that would create the impression that the Company was owned by an entity in the Structure.[264] It was Naeff who remembered the Deed of Assignment and perceived its potential use to create a new document trail.[265] He suggested the idea to Neupert, not the other way around.

Naeff and Neupert also evaluated what ownership options within the Structure would be optimal from a tax perspective. After relying on the Deed of Assignment to take the shares out of the UK Estate, they believed they could document whatever ownership allocation they wished.[266] Neither saw any reason to stick with the historical facts regarding the chain of ownership. They would paper a new one.

Neupert and Naeff's plan to rely on the Deed of Assignment foundered initially because the French attorneys at Olswang cared about the historical facts of ownership, not manufactured facts.[267] Faced with their refusal to embrace creative documentation, Neupert and Naeff agreed for purposes of filings with the French tax authorities that Israel had

---

[264] *See* PX 24; PX 25 at '059–60.

[265] *See* PX 25 at '058.

[266] *See id.*; PX 28 at '672.

[267] PX 28 at '670 ("We understand from your email below that the shares in the LLC have been transferred in May 2013 to a Liechtenstein foundation. Has the transfer been registered in the shareholders' registry (or other similar document) of the LLC?").

owned the Company's equity from its formation until his death.[268]

But after Lilly refused to sign a resolution purporting to appoint Neupert to the position of manager, Neupert implemented the plan he had developed with Naeff to convert the Company from an LLC to a corporation. Then, when they needed a plausible basis to claim that Neupert had authority to implement the conversion, Naeff again mentioned the Deed of Assignment.[269] With Naeff remaining complicitly silent, Neupert claimed repeatedly to have just discovered the Deed of Assignment, which he asserted resulted in the Foundation owning the shares since May 2013.[270]

From this point on, Naeff and his colleagues at Lopag embraced and endorsed Neupert's assertion of authority over and purported conversion of the Company. To assist Neupert, Naeff and Weiser misled ZEK when requesting a legal opinion. Naeff and Weiser initially provided ZEK with a limited set of documents designed to create the misimpression that the Deed of Assignment became effective immediately. The Lopag representatives did not provide any of their documents showing that the assignment had not been implemented in 2013 or at any time thereafter. They also did not provide any of the documents in which they maintained that the equity in the Company belonged to the UK Estate. Instead, after conferring with Neupert, Weiser falsely told Rubel that there were

---

[268] BX 33 at '302; PX 32; PX 30 at '160; *accord* PX 43.

[269] Naeff Tr. 171–72; *see* PX 103.

[270] PX 103.

no additional documents.[271] When still ZEK resisted giving the opinion, Weiser and Naeff falsely represented to ZEK that Neupert had authority to effectuate the conversion of the corporation as the executor of the UK Estate, a role that they knew Neupert never held.[272] When ZEK still would not issue the opinion, Naeff and Neupert created the Foundation Power of Attorney. Although they prepared it in late September or October 2016, they backdated it to February 5, 2016. By doing so, Naeff, Lopag, and the Foundation helped create a paper trail that would seem to validate Neupert's Delaware-related acts.

In evaluating Naeff's claims that Neupert acted unilaterally and without the involvement of anyone acting on behalf of the Foundation, I have taken into account Naeff's pattern of making false statements in the contemporaneous documents, as well as multiple instances in which he offered less-than-credible testimony.

- As discussed, Naeff falsely represented to ZEK that Neupert had authority to effectuate the conversion of the corporation as the executor of Israel's Estate, a role that Naeff knew Neupert did not hold.

- As discussed, Naeff remained silent when copied on emails in which Neupert invented the story that he and Naeff had recently discovered the Deed of Assignment.

- Naeff testified at the evidentiary hearing that he believed the Deed of Assignment effected an immediate transfer of the member interests in the Company from Israel to the Foundation.[273] The contemporaneous evidence shows that Israel and his advisors did not intend for the signing of the Deed of Assignment to implement an immediate transfer, because they believed the transfer would have adverse tax

---

[271] *See* PX 110; PX 113 at '833.

[272] PX 114; PX 125.

[273] *See* Naeff Tr. 26–29, 37, 42; *see also id.* at 26. *But see id.* at 113.

78

consequences for the Foundation during the 2013 tax year if completed before June 15, 2013.[274] Consistent with their belief, Naeff started attempting to implement the transfer in mid-June 2013 and maintained his efforts through February 2014.[275]

- Naeff testified at the evidentiary hearing that he did not know who owned the Company's equity between December 2013, when Israel declined to execute the documents prepared by the Wiggin firm, and February 2017, when ZEK opined based on a misleading record that the Deed of Assignment was effective.[276] During the period when Naeff claimed to be uncertain, he represented definitively on numerous occasions in contemporaneous emails that the UK Estate owned the Company's equity.[277]

- Naeff testified that he did not hear about the conversion of the Company into a corporation until December 2016.[278] This testimony was not credible. As early as August 2015, Naeff appeared on emails discussing a conversion.[279] In August 2016, Naeff and Neupert discussed sources of authority for a conversion, with Naeff suggesting the Deed of Assignment.[280] During Weiser's interactions with ZEK, he provided ZEK with the conversion documents,[281] and he conferred with Naeff

---

[274] *See* BX 5.

[275] *See* BX 13; BX 14; BX 16; BX 20; BX 23; BX 25; PX 8; PX 11.

[276] Naeff Tr. 53.

[277] *See, e.g.*, BX 26 (email dated March 28, 2015, from Naeff: "This is [*sic*] assignment is known to us, but it was never executed.") BX 33 (email dated October 20, 2015, from Naeff: "IIP was the sole shareholder of Cote D'Azur Estates LLC until his demise in March 2015."); PX 14 at '645 (email dated December 15, 2015, from Naeff to Tamar: "La Treille is held by Cote d'Azur Real Estate and a[s] such part of the estate."); PX 26 (email dated September 17, 2015, from Naeff to Monsenego, Neupert, and others: "La Treille belongs to the estate"); PX 94 at '554 (email dated July 18, 2016, from Naeff: "Until his death the settlor was the sole shareholder of Côte d'Azur LLC, Delaware, an entity that holds a property in France.").

[278] Naeff Tr. 196–97.

[279] *See* PX 25; *see also* Naeff Tr. 95–96; PX 28 at '672; PX 30 at '160.

[280] *See* PX 98; PX 99; PX 103.

[281] *See* PX 107.

during that process.[282]

Naeff acted and testified like a co-conspirator.

This decision has also drawn an adverse inference from Neupert's refusal to be deposed or to appear and participate in the evidentiary hearing. The resulting inference is that Neupert's testimony would have supported a finding that the Foundation knew about Neupert's acts and provided him with substantial assistance.

The knowledge of Naeff, Wieser, and other Lopag representatives is attributable to the Foundation. Moreover, during this period, Neupert was a member of the governing board of Lopag; he did not resign from that position until November 18, 2016.[283] The close coordination between Neupert and Lopag provides an additional reason to attribute Neupert's Delaware-directed activities to the Foundation.

The Foundation's representatives should have known that the Foundation could be sued in a Delaware court for its role in a conspiracy to use the Delaware Secretary of State as part of an effort to manufacture title to all of the equity in a Delaware entity. It is consistent with fundamental notions of fair play and due process for the Foundation to be subject to personal jurisdiction in this court.

[282] *See* PX 113.

[283] *See* Dkt. 33 Ex. 3 ¶ 43.

80

## III.      CONCLUSION

Lilly proved by a preponderance of the evidence that this court can exercise personal jurisdiction over the Foundation. The Foundation's motion to dismiss for lack of personal jurisdiction is denied.